# CASES

IN THE

# SUPREME COURT OF ILLINOIS.

## NORTHERN GRAND DIVISION.

SEPTEMBER TERM, 1872.

THE PEOPLE OF THE STATE OF ILLINOIS

*v.*

CHARLES L. WILSON AND ANDREW SHUMAN.

1. CONTEMPT—*what constitutes—power of the court to punish therefor.*
Contempts are defined to be, direct, such as are offered in the presence of
the court, while sitting judicially, or constructive, such, though not in its
presence, as tend to obstruct and embarrass or prevent the due administra-
tion of justice.

2. According to the general doctrine, any publication, whether by par-
ties or strangers, which concerns a case pending in court, and has a
tendency to prejudice the public concerning its merits, and to corrupt the
administration of justice, or which reflects on the tribunal or its proceed-

ings, or on the parties, the jurors, the witnesses or the counsel, may be visited as a contempt.

3. So where an article was published in a newspaper at a place remote from that at which the court was then being held, in reference to a case then pending, reflecting upon the action of the court therein, impeaching its integrity, and seeking to intimidate the court in respect to its action in the case, by a threat of popular clamor, it was *held:* the publication was a contempt of court, and punishable as such by process of attachment.

4. The power to punish for contempts is an incident to all courts of justice, independent of statutory provisions. The statute which declares that the Supreme Court "shall have power to punish contempts offered by any person to it while sitting," merely affirms a pre-existent power, and does not attempt to restrict its exercise to contempts in the presence of the court; but leaves them to be determined by the principles of the common law.

5. And if the statute should be regarded as a limitation upon the power of the court to punish for any other contempts than those committed in its presence, yet in this power would necessarily be included all acts *calculated* to impede, embarrass or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court.

6. Nor is it essential to the power to punish for a contempt in the publication of an article concerning the court and its supposed action respecting a pending case, that it should actually have been impeded, embarrassed or obstructed in the administration of justice in the particular case, but it is enough that it was the object and tendency of the publication to produce such an effect.

7. SAME—*of the intent—disclaimer.* Nor would it be accepted as a reason for discharging a rule to show cause, in such case, that the respondent disclaimed, in his answer, any intentional disrespect to the court, or any design to embarrass the administration of justice. The meaning and intent of the respondent must be determined by a fair interpretation of the language used by him in the objectionable article.

8. The construction and tendency of a publication, as bearing upon its character as a contempt, are matter of law for the court.

9. SAME—*of a mere excuse—appearance in person.* Where a party is under a rule to show cause why an attachment should not issue against him for a contempt, if he relies upon an excuse only he should appear in his own proper person. Not doing so, no mere excuse can be regarded as a cause for discharging the rule, but only as going to the question of punishment, in the event the court finds the absence of a legal justification in the return.

This was a proceeding in the name of The People, against Charles L. Wilson and Andrew Shuman, the publisher and editor of a newspaper published in the city of Chicago, called the " Chicago Evening Journal," for an alleged contempt of this court, in the publishing in said newspaper, on the 16th day of October, 1872, during the sitting of said court, at the September term, 1872, thereof, of an article which appeared as an editorial in said newspaper, in reference to the case of Christopher Rafferty against The People, which was then pending, on writ of error, in this court. .

The article referred to is set forth in the following information, presented to the court by the Attorney General, on the 23d day of October, 1872:

" STATE OF ILLINOIS, ⎫ *ss.*   Northern Grand Division,
　　Supreme Court, ⎭　　　*September Term, A. D.* 1872.

The People of the State of Illinois ⎫
　　　　　　*v.*　　　　　　　⎬   Information.
Charles L. Wilson and　　　　⎪
Andrew Shuman.　　　　　　⎭

"And now come the said People, by Washington Bushnell, Attorney General, and represent to the court that on the 16th day of October, A. D. 1872, there was, and still is, pending in this court, a certain cause for the adjudication and determination of this court, wherein one Christopher Rafferty is plaintiff in error and The People of the State of Illinois are defendants in error, and that, on the same day there was published in the city of Chicago, in said State, a certain daily newspaper called the Chicago Evening Journal, of which said paper on said day the said Charles L. Wilson was proprietor and the said Andrew Shuman was editor, and that said Charles L. Wilson and Andrew Shuman, on the said day, caused to be published in said paper, of and concerning said cause so pending in this court, and of and concerning this court and its supposed action with reference to said cause, a certain article, in the words following, that is to say: ·

" 'THE CASE OF RAFFERTY.'

" 'At the time a writ of *supersedeas* was granted in the case of the murderer Chris. Rafferty, the public was blandly assured that the matter would be examined into by the supreme court and decided at once; that possibly the hanging of this notorious human butcher would not be delayed for a single day. Time speeds away, however, and we hear of nothing definite being done.   Rafferty's counsel seems to be studying the policy of delay, and evidently with success.   The riff-raff who contributed fourteen hundred dollars to demonstrate that ' hanging is played out,' may now congratulate themselves on the success of their little game.   Their money is operating splendidly. We have no hesitancy in prophesying clear through to the end just what will be done with Rafferty.   He will be granted a new trial.   He will be tried somewhere, within a year or two. He will be sentenced to imprisonment for life.   Eventually, he will be pardoned out.   And this in spite of all our public meetings, resolutions, committees, virtuous indignation and what not.   And why?   Because the sum of fourteen hundred dollars is enough nowadays to enable a man to purchase immunity from the consequences of any crime.   If next winter's session of the legislature does not hermetically seal up every chink and loophole through which murderers now escape, it will deserve the bitter censure of every honest man in Illinois. We must simplify our modes of procedure in murder trials. The criminal should be tried at once, and when found guilty, should be hanged at once, and the quicker hanged the better. The courts are now completely in the control of corrupt and mercenary shysters—the jackals of the legal profession—who feast and fatten on human blood spilled by the hands of other men.   All this must be remedied.   There can be found a remedy, and it must be found.'

" Wherefore the said Attorney General, for and on behalf of the said People, moves this court for a rule upon the defendants,

Charles L. Wilson and Andrew Shuman, to be and appear before this court, on a day to be named, and show cause, if any they or either of them have, why an attachment should not issue against them for a contempt of this court in respect to the publication of said article.

WASHINGTON BUSHNELL,<br>
Attorney General."

Afterwards, on the 25th day of the same month of October, a rule was entered of record, requiring the said Charles L. Wilson and Andrew Shuman, on or before the coming in of the court on the first day of November next following, to show cause, if any they should have, why an attachment should not issue against them, for a contempt of this court, in the publishing of the article mentioned.

Accordingly, in obedience to such rule, on the said first day of November, there was filed in behalf of the respondent Wilson, the following answer:

"And now comes Charles L. Wilson, one of the above respondents, in obedience to the rule heretofore, to-wit: On the 25th day of October A. D. 1872, entered in said court, requiring this respondent and Andrew Shuman to show cause why an attachment should not issue against them, for a contempt of said court, on account of the matters and things in a certain information filed in said court, in said rule mentioned; and in answer to the said rule, this respondent says, that he is the sole proprietor of the said newspaper, mentioned in the said information, called the Chicago Journal, and that the article set forth in said information was published therein on the 16th day of October, 1872, but this respondent says that neither before, nor at the time of the publication, had he any knowledge or information relative to the same. This respondent did not know, before said paper in which the article appeared, was published, that said article, or any article upon

the subject, was written, or to be written, or that any article upon the subject was to be published, and that he neither advised or counseled, nor was he advised or counseled with by any person whatever, relative to the publication of said article, or any article whatever upon the subject.

" This respondent further says, that the first knowledge or information he had relative to said article, or its publication, was when he read the said article in said paper, after its publication and distribution.

" This respondent further says, that he is informed and believes that no disrespect was intended by said article to said court, or to any judge thereof, and that a fair construction thereof will not warrant an inference to that effect.

" This respondent is advised and believes that the publication of said article was not designed, and had no tendency to impede, embarrass or obstruct the administration of justice in said court.   And this respondent does, and will insist, that he had and still has the right, through his said paper, by himself or his agents, to examine the proceedings of any and every department of the government of this State ; and that he is not responsible for the truth of such publications, nor for the motives with which they were or are made, by the summary process of an attachment for contempt, save when such publications impede, embarrass or obstruct the administration of justice.

" This respondent further says, that such has been the established law of this State for over thirty years past, and that said court has no judicial power to change the same.

" This respondent takes this occasion to renew his repeated expressions of confidence in the ability and integrity of said court, and of the individual members of the same, and as evidence of the same gives the following article, which was published in said paper, issued on the 26th of September, 1872 ; that is to say :

"'The Supreme Court of Illinois, although, perhaps too ready to grant motions for *supersedeas*, has no sympathy with criminals. The judges are all men infinitely above any such suspicion. It is their business to examine every case appealed to them, without any bias, one way or the other, taking note solely of the facts presented in each case. The question for the higher court to decide is this: Did the accused, from first to last, have a fair trial? The presumption is that he did, and the rule is to grant a *supersedeas* only in case it is clear that he did not have a fair trial. While we cordially commend the zeal of the prosecuting attorney and of our courts in their efforts to check the appalling frequency of murders in this city and county, we suggest to them more caution in observing all the forms and technicalities of the law in the conduct of future murder trials. The supreme court will certainly continue to insist upon it, and every *supersedeas* granted acts as a premium upon murder.'

" This respondent further says, that at the time of the publication of said article, first mentioned, there was an intense excitement in the community, and particularly in the city of Chicago, on account of frequent murders, and the escape of the perpetrators thereof; and this respondent is informed and believes that the design of said article was to impress upon the community the importance of electing members of the next general assembly of this State, who would remedy the defects in the criminal law of the State, by which criminals are able to escape punishment, and not to reflect upon the ability or integrity of said court, or any member thereof, nor to impede, embarrass or obstruct the administration of justice. Wherefore, this respondent prays that the said rule, as against him, may be discharged.        CHARLES L. WILSON."

" STATE OF ILLINOIS, $\Big\}$ *ss.*
    Cook County.

" Charles L. Wilson, being duly sworn, says he is one of the respondents named in the foregoing answer, and that the matters stated in said answer are true.

CHARLES L. WILSON."

" Subscribed and sworn to before me this 29th day of October, 1872.        HENRY W. FARRAR,

Notary Public."

And on the same first day of November, the following answer was filed in behalf of the respondent Shuman:

" And now comes Andrew Shuman, one of the respondents, in obedience to the rule heretofore, to-wit: On the 25th day of October, 1872, entered in said court, requiring this respondent and Charles L. Wilson, to show cause why an attachment should not issue against them, for a contempt of said court, on account of the matters and things alleged, in a certain information filed in said court, in said rule mentioned, and in answer to the said rule, this respondent says, that he is managing editor of said newspaper, mentioned in the said information, called the Chicago Journal, and that the article set forth in said information, was published therein on the 16th day of October, 1872.

" But this respondent says that said article was not written by him, nor by his procurement or advice, but by an assistant editor of said newspaper. Which said article was submitted to this respondent for his examination, before the same was published, as are all articles prepared for publication in said paper. Upon the submission of said article to this respondent, he read the same, and allowed it to be published without dissent on his part, and without supposing that there was any thing in it disrespectful to, or in contempt of, said court, or of any of its judges or officers. The wording and expressions of

·Return of respondent Shuman.

said article were, as this respondent then believed and still
believes, designed and intended to impress upon the public,
and upon the next legislature of this State, the necessity of
such a change in the laws regulating and governing the trial
of persons accused or convicted of crime, as to ensure a more
speedy and certain punishment, and that this was the only
aim, purpose or intention of said article.

"This respondent further says, that a fair construction of
said article, will not warrant an inference that any disrespect
was intended by the same, to the said court, or any judge
thereof. This respondent is advised and believes, that the
publication of said article had no tendency to impede, embar-
rass or obstruct the administration of justice in said court;
that it was not so designed, and had not that tendency. And
this respondent does, and will insist, that he had and still
has the right, as managing editor of said paper, to examine
the proceedings of any and every department of the govern-
ment of this State, and that he is not responsible for the truth
of such publications, nor for the motives with which they
were or are made, by the summary process of an attachment
for contempt, save when such publications impede, embarrass
or obstruct the administration of justice.

"This respondent further says, that such has been the estab-
lished law of this State for over thirty years past, and that
said court has no judicial power to change the same.

"This respondent takes this occasion to renew his repeated
expressions of confidence in the ability and integrity of said
court, and of the individual members of the same, and as
evidence thereof, gives the following article, which was pub-
lished under his supervision, in said paper, issued on the 26th
day of September, 1872, that is to say:

"'The Supreme Court of Illinois, although, perhaps, too
ready to grant motions for *supersedeas,* has no sympathy with
criminals. The judges are all men infinitely above such

suspicion. It is their business to examine every case appealed to them, without any bias, one way or the other, taking note solely of the facts presented in each case. The question for the higher court to decide is this: Did the accused, from first to last, have a fair trial? The presumption is that he did, and the rule is to grant a *supersedeas* only in case it is clear that he did not have a fair trial. While we cordially commend the zeal of the prosecuting attorney and of our courts, in their efforts to check the appalling frequency of murders in this city and county, we suggest to them more caution in observing all the forms and technicalities of the law in the conduct of future murder trials. The supreme court will certainly continue to insist upon it, and every *supersedeas* granted acts as a premium upon murder.'

" This respondent further says, that at the time of the publication of said article, first mentioned, there was an intense excitement in the community, and particularly in the city of Chicago, on account of frequent murders, and the escape of the perpetrators thereof, and this respondent is informed, and believes, and so he understood at the time, that the design of said article was to impress upon the community the importance of electing members to the next general assembly of this State, who would remedy the defects in the criminal laws thereof, by which criminals are able to escape punishment, and not to reflect on the ability or integrity of said court, or any member thereof, nor to impede, embarrass or obstruct the administration of justice."

"Wherefore, this respondent prays that said rule, as against him, may be discharged. ANDREW SHUMAN."

"STATE OF ILLINOIS, } *ss.*
 Cook County. }

" Andrew Shuman, being duly sworn, says he is one of the respondents named in the foregoing answer, and that the matters stated in said answer are true.

ANDREW SHUMAN."

" Subscribed and sworn to before me this 31st day of October, 1872. 　　　　　　　　　CYRUS J. CORSE,
　　　　　　　　　　　　　　　　Notary Public."

Mr. WASHINGTON BUSHNELL, Attorney General, for the people :

I desire in this case respectfully to call the attention of the court to the following authorities, which in my judgment are conclusive upon the question of the power of this court to issue a writ of attachment against the respondents, for the publication of the matters and things contained in the information herein filed.

It is a contempt, punishable by attachment, to publish remarks in a newspaper, which have a tendency to prejudice the public with respect to the merits of a cause depending in court, and to corrupt the administration of justice. 4 Black. Com. 286 ; *Ex parte Biggs*, 54 North Car. 202 ; ib. 398 ; 1 Dall. 319.

A publication pending a suit, reflecting on the court, the parties to the suit, the witnesses, the jurors or the counsel, is a contempt of court. *Hollingsworth* v. *Duane*, Wallace, 77, 102 ; *Bronson's case*, 12 Johns. 460 ; 4 Black. Com. 286.

The publication of a paper to prejudice the public mind in a cause depending, is a contempt, if it manifestly refer to the suit, though it do not expressly appear on the face of the writing. *Respublica* v. *Passmore*, 3 Yates, 438.

Denying any criminal or disrespectful design, in publications reflecting on the proceedings before the court, will not justify the party, if they appear to the court to amount to a contempt. *People* v. *Freer*, 1 Caines, 485, 518.

The provision in the Constitution of the United States, that the trial of all crimes shall be by jury, does not take away the right of courts to punish contempt in a summary manner. The provision is to be construed to relate only to those crimes

206          THE PEOPLE *v.* WILSON *et al.*          [Sept. T.,

Brief of the Attorney General.

which by our former laws and customs had been tried by a jury. *Hollingsworth* v. *Duane,* Wallace, 77, 106.

The House of Representatives of the United States may punish persons not members thereof for contempt. *Anderson* v. *Dunn,* 6 Wheat. 204.

This power is incident to all legislative bodies, and extends to the imprisonment of the party for a period not beyond the adjournment or periodical dissolution of such bodies. *Ib.*

This power is also incident to courts of law and equity. *Mariner* v. *Dyer,* 2 Greenleaf, 165 ; *State* v. *White,* Charlt. 136 ; *Yates* v. *Lansing,* 9 Johns. 395 ; 6 Johns. 337 ; 4 Johns. 316 ; Trial of Smith & Ogden, 73 ; *State* v. *Tipton,* 1 Blackf. 166 ; 1st Burr's Trial, 352 ; *Clark* v. *People,* 1 Breese, 266 ; 8 Conn. 379 ; *United States* v. *Hudson,* 7 Cranch 32 ; see 1 Kent's Com. 3d ed. 300 (note B).

See also the case of *State* v. *Matthews,* 37 New Ham. 453, and authorities there quoted.

In the celebrated case of *The Commonwealth* v. *John Danbridge,* 2 Vir. Cases, 414, the court say : " They can not but feel it a delicate task to define and decide upon the extent of their own powers, nor be ignorant that the judgment they are called upon to render may expose them, on the one hand, to the imputation of timidity and irresolution, or on the other, to that of usurpation and tyranny. The verity of these suspicions would not be more unworthy of the judges than the fact of their shrinking from this question because of the consequences in which themselves might be involved in it.   *   *   *   In this country we know of no privileges but such as exist for the public good. Many such privileges we have, from those which appertain to the legislature itself down to such as belong to the lowest executive officer. Those which surround the administration of justice belong to the same order. Courts, their officers and process, are shielded from invasion and insult, not from any imaginary sanctity in the institutions themselves or the persons of those who compose them (as in the political

and ecclesiastical establishments of another hemisphere), but solely for the purpose of giving them their due weight and authority, and to enable those who admister them to discharge their functions with impartiality, fidelity and effect.

"This is the true test of every privilege not granted by statute, and is the spirit of every one (not merely private) which is so secured. The political character of the judiciary, and the tendency of the duties which are devolved upon it, have rendered it necessary to invest it with a considerable, share of these privileges.

"It is confessedly the weakest branch of all governments, wielding neither wealth, force nor patronage. Its duties consist in adjusting and settling the contested rights of individuals, in controling their turbulence and punishing their crimes. These duties are often of a severe and rigorous character, and they are generally to be discharged in almost immediate contact with those on whom they act. Their exercise will frequently elicit the angry passions, or excite unworthy and sinister attempts to bias or avert their operation, and where there is little real power and no patronage, a certain degree of external dignity may have been considered necessary to supersede a too frequent resort to the actual powers of the courts."

In 4 Blackstone, 283, that writer says: "The contempts that are thus punished are either direct, which openly insult or resist the powers of the courts, or the persons of the judges who preside, etc.;" and on page 285, in enumerating the contempts which degrade the judicial authority, he refers to one which consists "in speaking or writing contemptuously of the court or judges acting in their judicial capacity."

If the matters complained of arise at a distance, of which the court can not have so perfect a knowledge, unless by the confession of the party or the testimony of others, it will in its discretion award the proper process to bring the party

before it, of which process of attachment is one.    2 Vir. Cases, p. 436.

That to scandalize a court by speaking or writing, either in its presence or absence, is a high contempt.    Let the judges of a court be proclaimed in public print as corrupt cowards, when acting in their judicial capacity, and how long will it be before such judges. and the courts held by them will be covered with opprobrium and contempt?    *Ib.* 436.

It is a high contempt, punishable as aforesaid, to publish, by speaking or writing, anything during the pendency of a particular cause in any such court, by which an imputation is cast upon the judges, or any one of the judges, as to their purity, impartiality or integrity as respects that cause.    *Commonwealth* v. *Danbridge,* 2 Vir. Cases, 436 ; 2 Atkyns ; *Oswold's case,* and the case of *The King* v. *Barler,* Strange, 444.

I do not desire to enter upon an extended argument upon the merits of this application for a writ of attachment, and therefore content myself by referring this honorable court to the above authorities.

Messrs. BECKWITH, AYER & KALES, for the respondents.

MR. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court :

The respondents, Charles L. Wilson and Andrew Shuman, have been placed under a rule to show cause why an attachment should not issue against them for contempt.    The information filed by the Attorney General, upon which the rule was made, sets forth that one of the respondents is the proprietor, and the other the chief editor, of a newspaper published in the city of Chicago, called The Chicago Evening Journal, and presented as a ground for this proceeding, an editorial article published in that paper on the 16th day of October.    The article was set out at length in the information.

It is entitled " The case of Rafferty." Rafferty had recently been tried for murder, in Cook county, found guilty and sentenced to death. A writ of error, staying the execution of the sentence until the further order of this court, had been granted, and this writ of error was pending and undetermined before us at the date of the publication. The article published is as follows:

### " THE CASE OF RAFFERTY."

" At the time a writ of *supersedeas* was granted in the case of the murderer Chris. Rafferty, the public was blandly assured that the matter would be examined into by the Supreme Court and decided at once—that possibly the hanging of this notorious human butcher would not be delayed for a single day. Time speeds away, however, and we hear of nothing definite being done. Rafferty's counsel seems to be studying the policy of delay, and evidently with success. The riff-raff who contributed fourteen hundred dollars to demonstrate that 'hanging is played out,' may now congratulate themselves on the success of their little game. Their money is operating splendidly. We have no hesitancy in prophesying clear through to the end just what will be done with Rafferty. He will be granted a new trial. He will be tried somewhere, within a year or two. He will be sentenced to imprisonment for life. Eventually he will be pardoned out. And this, in spite of all our public meetings, resolutions, committees, virtuous indignation, and what not. And why? Because the sum of fourteen hundred dollars is enough nowadays to enable a man to purchase immunity from the consequences of any crime.

" If next winter's session of the legislature does not hermetically seal up every chink and loophole through which murderers now escape, it will deserve the bitter censure of every honest man in Illinois. We must simplify our mode of procedure in murder trials. The criminal should be tried at

14—64TH ILL.

once, and when found guilty, should be hanged at once,—and the quicker hanged the better. The courts are now completely in the control of corrupt and mercenary shysters,—the jackals of the legal profession,—who feast and fatten on human blood spilled by the hands of other men. All this must be remedied. There *can* be found a remedy, and it *must* be found."

To the rule granted upon the motion of the Attorney General, the respondents have severally answered under oath. They have declined to argue the case, either orally or in writing, though opportunity has been allowed for that purpose.

The respondent Wilson admits, in his answer, that he is the proprietor of the newspaper, but denies all knowledge of the article prior to its publication. While this fact should influence the degree of the punishment to which he may be liable, it does not exonerate him from responsibility. The respondent Shuman admits he is the editor in chief. He denies the authorship of the article, but says he read it before its publication, and permitted it to be published. Both respondents disavow any intentional disrespect to the court, or any design to embarrass the administration of justice, and insist that they have the right to examine the proceedings of every department of the government of this State, and that they are not responsible, in a proceeding of this character, for the truth of their publications, or for the motives with which they may be made, "save when such publications impede, embarrass or obstruct the administration of justice."

They state, under the solemnities of an oath, as a fact within their personal knowledge, that "such has been the established law of this State for over thirty years past, and that said court has no judicial power to change the same." Such a sworn statement, as to the law of contempt applicable to newspaper publications, is somewhat remarkable. If we give to the saving clause, in their answers, the interpretation which it was possibly designed to bear, the statement may be accepted

not merely as a truth, but as a truism. The only ground for pronouncing any act or publication a contempt of court, is, that it tends in its final results to "impede, embarrass or obstruct the administration of justice." If, on the other hand, the respondents designed to say, or to be understood as saying, that they are privileged to make any publications concerning proceedings in court, however false, to assail the integrity of the court, or to endeavor to inflame popular passion concerning cases pending before it, and not be liable to attachment for contempt, unless it appears that the publication complained of really has the actual and visible effect of impeding, embarrassing or obstructing the administration of justice, in a manner susceptible of proof as an accomplished fact,—if the answers are to be understood in this sense, it is to be regretted that the respondents were not better advised as to the law, before swearing what the law is.

The revised code of 1845, in speaking of the Supreme Court, contains the following provision :   "The said court shall have power to punish contempts offered by any person to it while sitting." This act has never been repealed or modified.

In the case of *Stuart* v. *The People*, 3 Scam. 405, decided in 1842, a similar provision in the statute of 1829, in regard to circuit courts, came before this court for construction. The court, after saying that the statute might, with great propriety, be regarded as a limitation upon the power of the court to punish for any other contempts than those committed in its presence, add the following most significant and important qualification :   "In this power would necessarily be included all acts *calculated* to impede, embarrass or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court."

The respondents evidently had this case before them when their answers were drawn. They use its language, with the exception of a most material word, which changes the meaning of the entire sentence. The respondents say the rule is, that

212        THE PEOPLE *v.* WILSON *et al.*        [Sept. T.,

Opinion of the Court: Lawrence, C. J.

publications are a contempt only when they impede, embarrass or obstruct the administration of justice. The rule laid down by this court was, that they are a contempt when they are *calculated* to have that effect. The difference is radical, and marks precisely the difference between the guilt or innocence of the respondents in this case. They swear to a rule which would require us to say that we have actually been impeded, embarrassed or obstructed in the administration of justice, before we can hold the respondents guilty of contempt. The true test is, not whether the court has been weak or base enough to be actually influenced by a publication, but whether it was the object and tendency of the publication to produce such an effect.

It need hardly be said that we can not accept, as a reason for discharging the rule, the disclaimer in the answers of any intentional disrespect or any design to embarrass the administration of justice. The meaning and intent of the respondents must be determined by a fair interpretation of the language they have used. They can not now escape responsibility by claiming that their words did not mean what any reader must have understood them as meaning.

No candid man can deny that the article in question was well calculated to make upon the public mind the impression that the court, in a pending case, was influenced by money in its judicial action, and that it could be so influenced in other cases. Neither can it be denied that the article seeks to intimidate the court as to the judgment to be pronounced in a case then pending and involving the life or death of a human being. The article declares that the money raised for Rafferty " is operating splendidly ; " predicts that he will be granted a new trial, and avers that " the sum of fourteen hundred dollars is enough nowadays to enable a man to purchase immunity from the consequences of any crime," and that " the courts are now completely in the control of corrupt and mercenary

shysters—the jackals of the legal profession." This language will bear but one interpretation.

I shall not stop to cite and discuss the authorities bearing on the law of contempt, as that labor has been performed by another member of the court. I merely quote the rule as laid down by Bishop, an American writer, in his work on Criminal Law, section 216. He uses the following language : "According to the general doctrine, any publication, whether by parties or strangers, which concerns a case pending in court, and has a tendency to prejudice the public concerning its merits, and to corrupt the administration of justice, or which reflects on the tribunal or its proceedings, or on the parties, the jurors, the witnesses or the counsel, may be visited as a contempt."

Whether tested by this common law definition or by the rule laid down by this court in the case of Stuart, already cited, there is no room for doubt that the article in question must be held a contempt of flagrant character. It related to a case in court involving in its final issues a human life. The answers of the respondents state that at the time of the publication " there was an intense excitement in the community, and particularly in the city of Chicago, on account of frequent murders, and the escape of the perpetrators thereof." This is no doubt true, and this article seems to have been studiously written, with a view to direct popular clamor against this court, and compel it either to affirm the judgment sending Rafferty to execution, or incur the imputation of bribery, and the clamor of an angry city to be echoed throughout the State by a portion of the Chicago press. The demand was not that we should calmly examine the record of Rafferty's trial to see whether his conviction had been legal, but that we should give him over to execution, because there was such impunity for crime in the city of Chicago that it was necessary some man should be immediately hung. We have since examined the record of this man's conviction, and reversed the judgment, all

the members of the court holding that a plain provision of the statute had been violated on his trial.

Let us say here, and so plainly that our position can be misrepresented only by malice or gross stupidity, that we do not deprecate, nor should we claim the right to punish, any criticism the press may choose to publish upon our decisions, opinions or official conduct in regard to cases that have passed from our jurisdiction, so long as our action is correctly stated, and our official integrity is not impeached. The respondents are correct in saying in their answers that they have a right to examine the proceedings of any and every department of the government.

Far be it from us to deny that right. Such freedom of the press is indispensable to the preservation of the freedom of the people. But certainly neither these respondents nor any intelligent person connected with the press, and having a just idea of its responsibilities as well as its powers, will claim that it may seek to control the administration of justice or influence the decision of pending causes.

A court will, of course, endeavor to remain wholly uninfluenced by publications like that under consideration, but will the community believe that it is able to do so? Can it even be certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on one side or the other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber, which it is the wise policy of the law to exclude.

Regard it in whatever light we may, we can not but consider the article in question *as calculated* to embarrass the administration of justice, whether it has in fact done so or not, and,

therefore, as falling directly within the definition of punishable contempts, announced by this court in the case of *Stuart* v. *The People.* It is a contempt, because, in a pending case of the gravest magnitude, it reflects upon the action of the court, impeaches its integrity, and seeks to intimidate it by the threat of popular clamor.

It may be said that, as long as the court was conscious it had not been frightened from its propriety by the article in question, the wiser course would have been to pass it by in silence.

So far as we are personally concerned, we should have preferred to do so. We desire no controversy with the press. But a majority of the court were of opinion that this publication could not be disregarded without infidelity to our duty. By our relations to the bar, to the suitors in our court, to the entire judiciary of the State, and to the State itself, we felt constrained to call the persons responsible for this publication to account.

It may further be said, that this article could do no permanent injury to a court strong in the consciousness of its own integrity, and in the confidence reposed in it by the people, and, therefore, the publication was unworthy of notice. It is quite true that a solitary paragraph, under ordinary circumstances, would have probably been innocuous. It is to be observed, however, that the answers of the respondents speak of the existing excitement in Chicago in regard to unpunished crime, and in that state of the public mind there was great probability that this article would win a ready credence if permitted to go unchallenged. Public meetings had been held, committees had been appointed to aid in the suppression of crime. The papers of Chicago, circulating throughout the State and the north west, had called attention to this subject. It was made a frequent topic of discussion in the public prints, and when, finally, this article appeared, in a paper of noted sobriety and respectability, containing charges and imputations

against this court, which were simply infamous, the majority of the court felt that it was necessary for the good name of the State, within and without its borders, and necessary in order to preserve the confidence of the people wholly unshaken in this court, to request the Attorney General to move for a rule against these respondents. The majority of the court still think they have acted wisely. We have been controlled by no feeling of personal malignity, and do not propose to inflict a severe punishment. We wish to call the attention of the press to the limits which circumscribe their comments on judicial proceedings, and to remind them of the obligations imposed upon them by the great power which they confessedly wield. Especially do we desire to keep the judicial reputation of the State free from the appearance of dishonor, and to prevent the growth of that distrust in the minds of our own people that would certainly follow the circulation of articles like the one under consideration, if permitted to go unrebuked.

The loss of public confidence in our integrity would be a calamity little less than the loss of official integrity itself. The pomp and circumstance which in England aid to clothe the courts and the law with dignity and power, are not in consonance with our republican form of government. In this country the power of the judiciary rests upon the faith of the people in its integrity and intelligence. Take away this faith and the moral influence of the courts is gone and popular respect for law impaired. Law with us is an abstraction. It is personified in the courts as its ministers, but its efficacy depends upon the moral convictions of the people. When confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence and crime.

The one element in government and society which the American people desire, above all things else, to keep free from the taint of suspicion, is the administration of justice in the courts.

Opinion of the Court: Lawrence, C. J.

So long as this is kept pure, a community may undergo extreme misgovernment and still prosper. But when these tribunals have become corrupt, and public confidence in them is destroyed, the last calamity has come upon a people, and the object of its social organization has failed. The protection of life, liberty and property is the final aim of all government. This is accomplished by an honest administration of just laws. The people, by their representatives, may be relied upon to pass such laws, but unless they are honestly administered, neither life, liberty nor property enjoys the security which it is the object of government and society to give. If the time shall unhappily ever come when the judiciary of this State has become hopelessly corrupt and justice is bought and sold, the loss of its moral and material well-being will as certainly follow as the night follows the day.

We are glad to say, that for more than half a century the judiciary of this State has not only enjoyed the confidence of the people, but also has received the support of the press. Never before, so far as the members of this court are aware, has the integrity of this tribunal been assailed by a public journal. The respectability of the paper in which the article in question has appeared, and the circumstances surrounding its publication, have given it a gravity which a casual article of like import would not possess. We have personally felt great reluctance to taking notice of the publication, but our consciousness of the mischief that may be done in embarrassing the administration of justice, and impairing the moral autnority of the judiciary throughout the State, if this article is to stand as an unpunished precedent, has compelled us to issue the rule, and now compels us to order an attachment.

It is the judgment of a majority of the court that an attachment issue against Charles L. Wilson and Andrew Shuman, returnable forthwith.

WALKER, J.   I am also of the opinion that a writ of attachment should issue in this case.

MR. JUSTICE MCALLISTER, concurring:

At the return of the rule to show cause, the defendants did not appear in person, but caused their separate returns under oath to be filed by attorneys, who declined to appear and argue the questions raised by the returns.   In this aspect of the case, it is unnecessary to consider how far the matters set forth go in excuse of the publication; because, if the defendants relied upon an excuse only they should have appeared in their own proper person.   Not having done so, no mere excuse can be regarded as a cause for discharging the rule, but only as going to the question of punishment, in the event that the court finds the absence of a legal justification in the return.   *The People* v. *Freer,* 1 Caines R. 519.

The only legal justification sought to be established by the returns, is the disavowal of a bad intent and matter of law arising upon the face of the whole proceedings.   In this behalf, their position is that they have the legal right to do just what they have done, and this court has no power or authority, by this proceeding, to call their acts into question, inquire into their motives or the pernicious tendency of the publication.   The editor of the paper states his position thus: "This respondent is advised and believes that the publication of said article had no tendency to impede, embarrass or obstruct the administration of justice in said court; that it was not so designed and had not that tendency; and this respondent does and will insist that he had, and still has, the right, as managing editor of said paper, to examine the proceedings of any and every department of the government of this State, and that he is not responsible for the truth of such publication, nor for the motives with which they were or are made, by the summary process of

attachment for contempt, save when such publications impede, embarrass or obstruct the administration of justice."

This position has been deliberately taken, and it is all there is of the case. If it has been well taken, the rule should be discharged; if ill, the attachment should issue. For the purpose of analyzing the alleged justification, we will treat it as in the nature of a plea in bar. Then what are its elements? By the return, actual participation in the act of publication by the editor, and constructive by the proprietor, are admitted. Then the only fact presented is the one of intent, by a disavowal of any bad intent; for the question, whether or not the publication had a tendency or was calculated to impede, embarrass or obstruct the administration of justice, is clearly a question of law, to be determined by the court upon inspection of the article. So also is that of the power of the court.

The return impliedly admits, that if the publication had the tendency to either, impede, embarrass or obstruct the administration of justice, the power of the court to punish the defendants for a contempt exists; but it claims virtually that the exercise of the power is precluded by the disavowal of any bad intent, and defendants' denial that the article had any such pernicious tendency. If the publication had the pernicious tendency which is claimed for it on behalf of the people, it is believed that no respectable authority can be found to the effect that a disavowal of a bad intent amounts to a justification. It would be contrary to the rule of law that every man must be presumed to intend the natural and necessary consequences of his own deliberate acts. In the case of *The People* v. *Freer*, above cited, which was a proceeding like this, the point was expressly adjudicated by the Supreme Court of New York, KENT, J. delivering the opinion of the court. "We can not but perceive," said that great judge, "that the disavowal of any bad intent will not do away with the pernicious tendency or effect of publications reflecting on judicial proceedings which are before us."

I have said that the construction and tendency of the article in question were a matter of law for the court. Of the truth of this proposition there can be no doubt. But the court is bound to give it a fair and reasonable construction, according to the natural and common import of the language employed; and when so construed, the question whether its publication constituted a contempt which the court is authorized to punish by attachment, must be determined by the character of the publication and the circumstances under which it was made.

As to the circumstances, it will suffice to say, that at the time of the publication, the case of Rafferty, referred to in the article, was pending before us for decision. This fact was well known to the defendants, and especially to the editor, as appears by both his return and the article itself. It is of that cause and its pendency here, that the article speaks; and the ordinary and natural meaning of the language used conveys, in the most direct and unequivocal manner, the charge of corruption, on the part of this court, in respect to that very case; and was calculated and intended to portray the character and position of the court as being so degraded as to be under the control of the most unprincipled and despicable class of society. The first paragraph, relating to the delay of the court in deciding the case, evidently refers to its action at the time of allowing the *supersedeas*, in requiring Rafferty's counsel to submit the cause, in order that it might be passed upon at this term. Then it proceeds: "The riff-raff who contributed fourteen hundred dollars to demonstrate that 'hanging is played out,' may *now* congratulate themselves on the success of their little game. Their money is operating splendidly. We have no hesitancy in prophesying clear through to the end just what will be done with Rafferty. He will be granted a new trial. He will be tried somewhere, within a year or two. He will be sentenced to imprisonment for life. Eventually he will be pardoned out, and this in spite of all our public meetings, resolutions, committees, virtuous indignation and what not. And

why? Because the *sum of fourteen hundred dollars is enough
nowadays to purchase immunity from the consequences of any
crime."* Then, that there might be no misunderstanding as to
what is meant by this tissue of scandal, there come these sig-
nificant words: " The courts are now completely in the control
of corrupt and mercenary shysters—the jackals of the legal
profession—who feast and fatten on human blood spilled by
the hands of other men." This expression would be under-
stood, and was intended, to refer to this court, which was the
only one previously alluded to; and what more degrading and
scandalizing charge could be couched in language? It is well
understood by the public that this court is the only one in the
State which has the power to license and strike the names of
attorneys from the rolls. If the court is under the complete
control of the vile class designated, the degradation must be
voluntary on the part of the court, yet it is here proclaimed
to the public that a court which possesses the power to rid itself
of the shysters and jackals of the legal profession, is never-
theless completely under their control. After this charge is
followed what may well be called a threat: " All this must
be remedied; there can be found a remedy, and it *must* be
found."

The tendency of the article is to degrade and scandalize the
court, to overawe its deliberations and extort a decision against
the accused. That such was the intent and purpose, scarcely
admits of a doubt. In this attempt to extort a decision of
affirmance rests the great criminality of the article, rather than
the reflections upon the court. Publications scandalizing the
court, and intended to unduly influence and overawe its delib-
erations in causes pending, are contempts which this court is
authorized to punish by attachment, and it is essential to the
dignity of character, the utility and independence of the court,
that it should possess and exercise such authority. Here the
corruption is imputed, and the effect predicted in such a man-
ner as to prepare the public mind to believe the charge, if the

decision turns out to be as predicted.   Any well constituted
judge would receive the threats of a mob gathered about the
court house for the purpose of overawing his deliberations
upon a particular case, with far greater coolness and equa-
nimity than such a threatened blot upon his character.
Whatever may be the character of Rafferty, however humble
and lowly in life, or however bad a man he may be, he is
nevertheless clothed with the same constitutional rights
which belong to the highest and best citizens in the state.
He can be deprived of his life only by due process of law.   He
has the same right to invoke the safeguards devised for the pro-
tection of innocence and to secure a fair and impartial trial, as
though he were in fact innocent, and as any other citizen might
do; because the law is, and in the nature of things must be,
general in its application.   The establishment of these rights
by our beneficent constitution has cost too much suffering and
blood, though in the distant past, to be readily relinquished by
an intelligent people; and it seems an extraordinary spectacle
to witness such an attack upon the character of this court,
acting under the sanction of an oath of office, for exhibiting in
its judicial action a proper respect for principles heretofore
esteemed so sacred and so indispensable to the proper protec-
tion to life and liberty, and I can not refrain from remarking
in this connection, that if this publication was made for the
purpose of destroying those safeguards, as a necessity for the
suppression of the crime of murder in Chicago, as is avowed
in the return, such a purpose ought to enhance instead of miti-
gating the criminality of the publication.   It would take a
long time, in my judgment, to inspire those criminally disposed,
those born and reared in the haunts of vice, neglected by parents
and society, without moral development, with a feeling of just
respect for the sanctity of human life, by giving them examples,
frequent examples, of the summary and reckless violation of
that sanctity, by the public authorities, under forms of law
divested of all the consecrated principles for the protection of

innocence, by trials which could not be otherwise than grim mockeries of justice, controlled, swayed, and their results dictated by the passion and popular clamor of the hour.   While I may truly say, that I have no feelings of resentment for the unwarranted attack upon the court, of which I am a member, yet for this assault upon institutions which I have been educated to revere, I have feelings of deprecation and sorrow; and it is to be believed that a little careful observation and sober reflection will lead both the people and the press of Chicago to the conclusion that the fault lies not in the law nor yet in the courts.   It seldom happens that a good and careful lawyer, who has a good cause and wins it, has any trouble with errors in his record.

It is an unpleasant duty, but I feel constrained by the deepest convictions of conscience, by a lively regard for the credit of the State and her institutions, for the administration of justice, to concur in the opinion, that the rule should be made absolute and that an attachment should issue.

MR. JUSTICE THORNTON, also concurring:

A return has been made to the rule issued in this case, in which the respondents acknowledge the publication of the article, in the Chicago Evening Journal, and insist upon the right, through their paper, to examine the proceedings of every department of the government of the State, and that they are not responsible for such publications, nor answerable to the summary process of attachment for contempt, unless the publications impede, embarrass, or obstruct the administration of justice.   It is also urged the publication had no such tendency.

The cause pending in the court, when the obnoxious publication was made, was *Rafferty* v. *The People.*   Rafferty had been found guilty of murder, in the court below, and sentenced to be hanged.   As was his right, according to the constitution

224          THE PEOPLE *v.* WILSON *et al.*     [Sept. T.,

Concurring Opinion: Thornton, J.

and laws of the land, he demanded of this Court a calm and dispassionate examination of the facts and questions presented in the record, and insisted that the law had been violated in his trial and conviction.

The life of a fellow man awaited our decision. The result, to him, was fearful; grave responsibility rested upon the court and the counsel, and solemn deliberation was required.

Under such circumstances, the publication was made, and while the court was in session. It refers to the court, and the case pending in it;—intimates that the court had blandly assured the public that there should be a speedy examination; asserts that time had sped away, and no information had been given that any thing definite had been done;—that the prisoner's counsel was studying the policy of delay, with success; that the sum of fourteen hundred dollars, contributed to demonstrate that " hanging is played out," is operating splendidly;—that the prisoner will be granted a new trial, and finally pardoned, in spite of the virtuous indignation of the public, " *because the sum of fourteen hundred dollars is enough nowadays to enable a man to purchase immunity from the consequences of any crime*," and then charges that " the courts are now completely in the control of corrupt and mercenary shysters—the jackals of the legal profession—who feast and fatten on human blood spilled by the hands of other men." The slight allusion to the action of the legislature can not relieve the gross attack upon the court and its officers. The case referred to in the publication has been reversed by an unanimous court, for manifest error in denying the accused a change of venue, and thus, it may be, depriving him of an impartial trial, vouchsafed to him by the constitution and the laws.

Was the publication a contempt of court? Or can there be none, except for disobedience of its orders or process, or disorderly or contemptuous behaviour in its presence?

The law, as it is written, must answer. In 2 Hawkins, 220, contempts are classified, as contempts in the face of the court, and contemptuous words or writings concerning the court. Again, they are termed ordinary or extraordinary. The latter consists of abusive and scandalous words respecting the court. Bouvier's Inst. vol. 4, 385. According to Blackstone, book 4, 285, they may be committed either in the face of the court, or " by speaking or writing contemptuously of the court or judges acting in their judicial capacity."

This court has defined them to be, direct, such as are offered in the presence of the court, while sitting judicially, or constructive, such, though not in its presence, as tend by their operation to obstruct and embarrass or prevent the due administration of justice. *Stuart* v. *The People,* 3 Scam. 395.

Bishop thus defines constructive contempts : " According to the general doctrine, any publication, whether by parties or strangers, which concerns a cause pending in court, and has a tendency to prejudice the public concerning its merits, and to corrupt the administration of justice, or reflects on the tribunal or its proceeding, or on the parties, the jurors or the counsel, may be visited as a contempt." Vol. 2, sec. 26.

In this State the constitution has established the judiciary, and made it a co-ordinate department of the State government. A necessary incident to its establishment is the power to punish for contempts.

This court held, in an early case, that the power to punish for contempts was an incident to all courts of justice, independent of statutory provisions. *Clark* v. *The People,* Breese, 340. Courts in other States have also announced the doctrine that this power is inherent in all courts of justice—necessary for self protection, and an essential auxiliary to the pure administration of the law.' *United States* v. *New Bedford Bridge,* 1 Woodbury & Minot, 407 ; *State* v. *Johnson,* 1 Brevard, 155 ; *Yates* v. *Lansing,* 9 Johns. 416 ; *Cassart* v. *The State,* 4 Ark. 541 ; *Neil* v. *The State,* 4 Eng. (Ark.) 263 ; *United States*

15—64TH ILL.

v. *Hudson,* 7 Cranch, 32.   The statute likewise approves the
exercise of the power, when it provides that the supreme
court "shall have power to punish contempts offered by any
person to it while sitting."   This provision was in force July
1st, 1829, and was the law when the decision in the case of
*Stuart* v. *The People, supra,* was rendered.   The court then
declared that the statute "affirms a principle inherent in a
court of justice, to defend itself when attacked, as the indi-
vidual man has a right to do for his own preservation."
The statute merely affirms a pre-existent power, and does not
attempt to restrict its exercise to contempts in the presence
of the court; but leaves them to be determined by the princi-
ples of the common law.

Without the power courts could not fulfill their responsible
duties for the good of the public.   They would lose all self
respect, and would not perform the duty they owe to the State,
if they failed to struggle for their independence and defend
their life.

No one doubts either the right or duty of a court to punish,
as contempts, rude and contumelious behaviour, breaches of
the peace, or any willful disturbance in its presence.

Whence the necessity for the exercise of the power?   It is
that the law may be administered fairly and impartially,
uninterrupted by any influence which might affect the safety
of the parties, or the judge or officers of the court,—that the
court may have that regard and respect so essential to make
the law itself respected,—and that the streams of justice may
be kept clear and pure.

If the court is scandalized and its integrity impeached,
while a cause is pending before it,—if the counsel are grossly
libelled, and low and obscene terms are applied to them, which
may have the effect to intimidate, the consequences must be
the same as if direct contempts are offered.   The administra-
tion of the law is embarrassed and impeded, the passions,
often unconsciously, are roused, the rights of parties are

endangered, and a calm and dispassionate discussion and investigation of causes are prevented.

The authority to punish for constructive contempts has been recognized by numerous courts, in England and America. I shall merely cite a few of these cases. *Republica* v. *Passmore*, 3 Yeates, 441; *Oswold's Case*, 1 Dallas, 319; *People* v. *Freer*, 1 Caines R. 515; *Tenney's Case*, 3 Foster (N. H.) 162; *Hollingsworth* v. *Duane*, Wallace C. C. U. S. 77; *United States* v. *Duane, id.* 102.

In *Tenney's Case*, the respondent was interested in a suit brought by his son against one of the defendants in a bill of equity, in which suit the son was unsuccessful, but he was not a party to and had no interest in the suit in equity, and while the bill was pending he caused copies thereof to be printed and circulated extensively. The bill contained serious charges, and the respondent also said that he could stop the proceedings in equity if one thousand dollars were paid to him.

The conduct and language were out of the presence of the court, and it was held to be a contempt, and calculated to disturb the free course of justice. In conclusion, the court said :

" The circulation of such charges, in the absence of proof, by a person unconnected with the questions to be tried, was dishonorable and vindictive in the highest degree, and an unwarrantable interference with the administration of justice."

In *Republica* v. *Passmore, supra,* the defendant affixed a writing to a board in the exchange room in the city tavern, reflecting upon the parties to the suit, and the court held that the publication of such a paper prejudiced the public mind in a cause depending in court, and was a contempt.

In *Oswold's Case*, the publication in a newspaper, of wanton aspersions upon the character of the opposite party, was ruled to be a contempt, and Chief Justice McKean said, that without the power to punish for contempts no court could possibly exist.—" Nay, that no contempt could, indeed, be committed against us, we should be *so truly contemptible.*"

In the case of *The People* v. *Freer, supra,* a publication was made in a newspaper in regard to a cause under investigation, and was intended to prejudice the public mind against the court, and to intimidate it in its decision on the motion for a new trial in the case of *The People* v. *Croswell.* KENT, J. afterwards Chancellor, delivered the opinion of the court, and said that publications scandalizing the courts, or intending, unduly, to influence or overawe their deliberations, were contempts, which should be punished by attachment ; and that it was essential to their dignity of character, their utility and independence, that they should possess and exercise such authority.

In *United States* v. *Duane,* there was a publication in a newspaper, pending the cause, reflecting upon the court and jury. The court held that it was a contempt, which had a tendency to deter counsel and intimidate the court, if they were susceptible of intimidation.

In *The State* v. *Morrill,* 16 Arkansas, 384, a publication was made in a newspaper, while the court was in session, which, in the language of the court, seemed " to intimate, by implication, that the court was induced by bribery to make the decision referred to." It was regarded as a contempt, and an imputation upon the purity of the motives of the members of the court while acting officially in a particular case.

In determining the sufficiency of a plea to the jurisdiction of the court, Chief Justice ENGLISH delivered an able opinion, and held that the right to punish for contempts was inherent in all courts of justice—a part of their life and a necessary incident to the exercise of judicial powers—that the section in the Bill of Rights, that " every citizen may freely speak, write and print on any subject, *being responsible for the abuse of that liberty,*" gave the right to any citizen to publish the proceedings and decisions of courts, to comment upon them freely, discuss their correctness, the fitness or unfitness of the judges, and the fidelity with which they perform

their public trusts; but not by defamatory publications, to degrade the tribunal, destroy public confidence in it, and thus dispose the community to set at naught its judgments and decrees.

In the class of constructive contempts, this court has said, " would necessarily be included all acts calculated to impede, embarrass or obstruct the court in the administration of justice. Such acts would be considered as done *in the presence of the court."* *Stuart* v. *The People, supra.*

The power is arbitrary, and should be exercised with prudence and moderation, and only in extreme cases. Indeed, all power is arbitrary; but this furnishes no reason why the silent power of a court should not be awakened to restrain wrong, and to check the attempt to destroy all respect for the law by calumniation of its officers, who are the channels by which justice is conveyed to the people.

What is the nature and character of the publication, and what is its tendency and effect?

This court is charged, impliedly, if not directly, with bribery. If such was not the intent, words are useless to convey an intent. This court, and the cause pending therein, are mentioned, and a new trial predicted, not because the law demands it, but because immunity from crime can be purchased.

It is said that the money had been contributed. This court, at the time, had the control of the cause, and the power to condemn or acquit; and the charge is that it is so corrupt and debased, that it will sell justice for a paltry sum, violate a solemn oath, and release a murderer in willful disregard of the law.

The legislature is then threatened with bitter censure, unless it provides the most summary procedure in trials for murder, and immediate hanging upon conviction.

Wherefore this public outcry against the criminal law? The answer is given, because the courts are now completely in

the control of corrupt members of the legal profession. This is defamatory of the court, as well as the profession, and particularly so of the counsel for the accused, an officer of this court of pure character and high standing.

Can it be possible that a court has power to punish at discretion, and in .a summary mode, by fine and imprisonment, slight and trivial offences in its presence, merely temporary in their effects, an undulation of the quiet surface, and can not punish for calumny, and defamation and impeachment of its integrity, which tend to embarrass its action, destroy its independence, rob it of its good name, intimidate it, if timidity is an element in its constitution, and eventually to degrade it?

Has it no' power to protect counsel from the effect of publications, which are calculated to deter them from a bold and manly defence of suitors, for fear of the denunciation of the press?

No man who values character more than. riches, and who has a consciousness of his own integrity, can aspire to be a member of a court; no lawyer, imbued with the spirit of an honorable profession, and who appreciates his own manhood, will practice in a court when infamous and damning charges are published against them while a cause is pending,—and there is no power to stay the calumny and afford 'protection, by summary punishment.

The exercise of the power to punish for such publications, is not an abridgment of the freedom of the press. It can be no restraint upon the right to examine the proceedings of every branch of the government.

It is no restriction upon the privilege, secured to every citizen in the Bill of Rights, that " every person may freely speak, write and publish, on all subjects, *being responsible for the abuse of that liberty.*"

These rights have well defined limits. They are correlative, and must respect other rights. They are not independent of

all control. Even liberty is not unlicensed, but is regulated by law. The press can be free, in the broadest sense of the term, without blackening character or having a license to defame. Every man may freely speak and write without indulgence in slander or libel. Every branch of the government may be freely examined without false accusation, and unjust charges of crime against those who hold positions of trust. The truth is never to be feared, and may always be spoken and written; but the utterance of willful and deliberate falsehood, disguise it as you may with good intentions, is dangerous and cowardly, and deserves punishment and reprobation. It is an abuse of the rights guaranteed by the constitution.

This court has not the power, nor the desire to arrogate it, to direct or control the press, in its legitimate sphere. Freedom of speech, and of the press, should be most jealously guarded. The utmost latitude should be allowed for fair, full and free review of the entire action of the courts. Just criticism may assail the opinions, expose their fallacy, and warn of their errors. The opinions of courts are not solemn edicts, to be blindly assented to, but are subject to calm and fearless stricture. The good taste and severity of the language,—the weapons to be employed,—whether reason or ridicule, must be determined by the writer. In popular governments, neither the public action nor official opinion of persons, in positions of trust, can be exempt from condemnation by the press, or in the assemblages of the people. But there must be toleration, for " error of opinion should always be tolerated, when reason is left free to combat it." This character of animadversion should never be regarded as a contempt of court.

The freedom of the press, however, is fully protected, without licensing libel and ribaldry, and charges of corruption and bribery, against courts and their officers. Whatever the intent may be, though it may mitigate the offence, it can not lesson the injury to character, or undo the mischief.

The right of the respondents must be conceded to examine the proceedings of every department of the government, not in passion and with abuse, but with fair and manly argument. Good will then result, error may be exposed, and reason will resume its sway. Then the press will be a power and a blessing, and will exercise its constitutional right.

The publication under consideration is not criticism. Its tendency is to embarrass the court. It charges crime, when none exists. It is scandalous, abusive, passionate, in tone and spirit. It impugns the integrity of this court, and classes the counsel of the accused amongst the most degraded of the profession. Its false charges of crime are calculated to disturb the mind of the pure man, and unfit him for the discharge of arduous and responsible duties. Abuse can never convince. Passion must rouse passion.

The tendency must be to impair the usefulness of this court, deprive it of respect, obstruct it in the due administration of the law, and if silently submitted to, so debase it as to present it a spectacle, beneath even contempt.

I concur in the issuance of the attachment.

MR. JUSTICE SCOTT, dissenting:

Having been opposed in the first instance to issuing the rule to show cause, I am of opinion, after more mature reflection, that the rule should not be made absolute.

Whatever may be the true construction of the article set out in the information, the respondents have both denied, under oath, any purpose in its publication to obstruct or influence the administration of the law, or any intention to reflect upon the integrity of any member of the court; and this, it seems to me, is all that they ought to be required to do. No public good can possibly result from pressing the matter further. Independently of the disclaimer on the part of the respondents, I am unable to perceive how the article in question could

in any manner affect, hinder or obstruct the administration of
the law in this court.   The newspaper in which the paragraph
was printed was published in a city distant from the one where
the court is now holding its sessions, and it was not thrust
upon the attention of the court by the respondents or anyone
else.   It is unlike the objectionable article in the case of
*Stuart* v. *The People*, 3 Scam. 397, which was published in
the city where an important trial was pending before a jury,
and which, with some propriety, could be said to be a con-
structive contempt, committed in the presence of the court.
If it is anything more than simply an unjust criticism on the
court in reference to a cause then pending, the most unfavora-
ble view that can be taken is that it is a constructive contempt,
and as such it could not directly or indirectly affect the admin-
istration of justice in an appellate court.   I should be very
unwilling to admit that it could have any such effect.   It
seems to me that the majority of the court have attached an
undue importance to a mere newspaper paragraph.

From an early period in the history of our jurisprudence, the
power has been conceded to all courts of general jurisdiction to
punish, in a summary manner, contempts committed in their
presence.   The right rests on the necessity that was found to
exist to enable courts to *administer* the law without interruption
or improper interference, and to maintain their own dignity.
So indispensable is this power that its just exercise, so far as
it may be necessary for the due protection of the courts, has
never been questioned.

The legislature has provided that the Supreme and Circuit
Courts may punish parties for contempts committed against
them while sitting, and it is a very grave question whether it
was not the intention, by implication at least, to limit the
power of courts to punish for contempts to such as should be
committed in their presence.   I am not, however, unmindful
that courts of the highest authority in this country and in
England have assumed jurisdiction to punish, in a summary

manner and on their own motion, what are termed constructive contempts—such an one as is sought to be set forth in the information filed.

The exercise of this extraordinary power by a court of final jurisdiction has ever been regarded as of questionable authority, and one liable to great abuse, and which might become dangerous to the liberty of the citizen. Its exercise by the courts in this country has been tolerated rather than conceded by constitutional provisions or legislative enactments. The objection proceeds on the ground that the court ought not to assume to be the judge of the offence against itself, and of the mode and measure of redress, where the law has provided, and where in the very nature of things there can be no mode of reviewing the action of the court in the premises. There has always existed jealousy against the exercise of arbitrary power, by any tribunal, supposed to be derived from common law sources, and not expressly granted by constitutions or the laws enacted by legislative assemblies. It must be conceded that public journals have the right to criticise freely the acts of all public officers,—executive, legislative and judicial. It is a constitutional privilege that even the legislature can not abridge. Such criticism should always be just and with a view to promote the public good. In case the conduct of any public officer is willfuly corrupt, no measure of condemnation can be too severe; but when the misconduct is simply an honest error of judgment, the condemnation ought to be mingled with charity.

The public have a profound interest in the good name and fame of their courts of justice, and especially of the courts of last resort. Everything that affects the well-being of organized society, the rights of property and the liberty of the citizen, is submitted to their final decision. The confidence of the public in the judiciary should not be wantonly impaired. It is all important to the due and efficient administration of justice that the courts of last resort should possess in a full measure

the entire confidence of the people whose laws they administer. All good citizens will admit that he who willfuly and wantonly assails the courts by groundless accusations, and thereby weakens the public confidence in them, commits a great wrong, not alone against the courts, but against the people of the commonwealth.

But who shall furnish the remedy? Shall the court that is assailed, or shall the legislative power of the State? In my judgment, there are many and politic reasons why the legislative power alone should provide the remedy, if any shall be found to be necessary. It is far better that the judges of the courts should endure unjust criticism, and even slanderous accusations, than to interpose of their own motion to redress the offence against themselves, where the offence complained of is not committed in their immediate presence. It is a matter of public history that it has been the policy of the press in this country to uphold and maintain the authority and dignity of the courts. If a contrary policy should ever be inaugurated in this State, to such an extent as to seriously affect the reputation or impair the efficiency of the courts in the administration of the law, I have no doubt that the legislature will afford an appropriate remedy. It was said by this court, in the case of *Stuart* v. *The People, supra,* that respect to courts can not be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence, and while they are found on the judgment seat, so long and no longer will they retain the public confidence.

MR. JUSTICE SHELDON, also dissenting:

I do not concur in the action of the majority of the court, in this case.

I am opposed to the exercise of the power of punishing for constructive contempts, where the alleged contempt consists merely in personal aspersions upon a court, contained in a

newspaper article; especially in the case of an appellate court, where I am unwilling to admit that newspaper paragraphs affect or are calculated to embarrass the administration of justice.

MR. JUSTICE BREESE also dissented from the action of the majority of the court, in entering the rule and awarding the attachment.

The writ of attachment awarded by the court, was issued on the 6th day of November, 1872, in the following form:

"STATE OF ILLINOIS. ⎫        IN THE SUPREME COURT,
                    ⎬ Northern Grand Division, September
                    ⎭        Term, A. D. 1872.

The People of the State of Illinois, to the Sheriff of LaSalle County—*Greeting:*

" Whereas, it has been made to appear that Charles L. Wilson and Andrew Shuman have printed and published an article, which has been adjudged by the said court, now in session at Ottawa, in the aforesaid county and State, to have been printed and published in contempt of said court while so in session, as aforesaid.

" We, therefore, command you, that you attach the said Charles L. Wilson and Andrew Shuman, so as to have their bodies forthwith before our said supreme court, at Ottawa, in the county aforesaid, to answer the said court of the said contempt, by them lately committed against it, as it is said, and further, to do and receive what our said court shall in that behalf consider. Hereof fail not, and have you then and there this writ.

" Witness, Charles B. LAWRENCE, Chief Justice of said court, and the seal thereof, at Ottawa, this 6th day of November, in the year of our Lord one thousand eight hundred and seventy-two.                    W. M. TAYLOR,
                            Clerk of the Supreme Court."

On the 8th day of November the respondents appeared in court, in answer to the writ of attachment, whereupon the Chief Justice pronounced the following sentence:

You, Charles L. Wilson and Andrew Shuman, are before this court under an attachment for contempt, in consequence of an article relating to a cause pending in this court, and published in a newspaper of which you, Charles L. Wilson, are the proprietor, and you, Andrew Shuman, are the chief editor.

In the opinion delivered by the majority of this court, when passing upon your return to the rule to show cause why an attachment should not issue against you, we have said all that we desire to say in regard to the character of the publication, and the injury which such publications tend to cause to the administration of justice. It was then held that your answer showed no reason why an attachment should not issue. It now only remains to impose upon you a penalty for the offence. It is in the power of the court, in cases of this character, to punish by both fine and imprisonment. We have, however, no desire to inflict a severe penalty. Our object will be accomplished if we show to the press that it can not be permitted to attempt to influence the decision of cases pending in the courts. We are not unmindful of the fact that neither of you wrote the objectionable article, and that you, Charles L. Wilson, did not see it before its publication. We shall impose upon you only a moderate fine, as we can not believe you are likely to commit similar offences in the future.

You, Charles L. Wilson, are adjudged to pay a fine of $100, and you, Andrew Shuman, are adjudged to pay a fine of $200, to the treasurer of this State. You are also adjudged to pay the costs of this proceeding. The fine will be paid to the clerk of this court, who is directed to remit the same

immediately to the State treasurer, and procure his receipt therefor, to be filed among the papers in this case.

The sheriff will hold the respondents in his custody until the fine and costs are paid to the clerk.