## EL PUEBLO *v.* ABRIL.

### PROCEDIMIENTO por desacato.

No. 1. Resuelto en Junio 20, 1905.

DESACATO.—PUBLICACIÓN FALSA Ó INEXACTA DE PROCEDIMIENTOS JUDICIALES.—La publicación voluntaria de cualquier informe falso ó manifiestamente inexacto relacionado con un procedimiento judicial, constituye el delito de desacato, según el No. 5 de la Sec. 1 de la Ley de Marzo 1, 1902.

Los hechos están expresados en la opinión.

Abogado del Pueblo: *Sr. Rossy, Fiscal.*

Abogado del acusado: *Sr. Vías Ochoteco.*

EL JUEZ ASOCIADO SR. HERNÁNDEZ, emitió la opinión del tribunal.

El presente es el primer caso de desacato de su clase á ésta Corte Suprema, sometido á la jurisdicción originaria de la misma.

En el número 4052 del periódico "La Democracia", de esta Capital, correspondiente al día siete de abril del corriente año, bajo el epígrafe "Lo de Toa-Baja.—Triunfo electoral evidente, quizás perdido por la calma del Tribunal Supremo.—Ya es tiempo.—El recurso del abogado unionista duerme porque la ponencia no se despacha", se publicó un artículo que copiado á la letra dice así:

"Lo de Toa-Baja.—Triunfo electoral evidente, quizás perdido por la calma del Tribunal Supremo.—YA ES TIEMPO.—El Recurso del abogado unionista duerme, porque la Ponencia no se despacha.

"Al Tribunal Supremo de Puerto Rico, que es la más alta representación de la Justicia en este país, consagró siempre LA DEMOCRACIA sus mayores respetos.

"Y seguirá consagrándoselos.

"Pero el Partido Unionista tiene intereses que defender á todo trance y la prensa unionista sería criminal si abandonara los intereses de su Partido.

"En Toa-Baja vencieron nuestros correligionarios por mayoría de votos. Y, en presencia de ese triunfo, nuestros adversarios acudieron á los más ridículos ardides, prevaliéndose de SU DOS POR UNO en las Juntas Electorales y anulando ciento ocho papeletas por la *simple,* simplísima razón de que las cruces no llegaban á la línea de los círculos que están al frente de las boletas.

"Aquella añagaza, tan burda y necia, no podía prevalecer. Y, el señor Benítez Castaño presentó un recurso de *mandamus* ante el Supremo, del cual recurso depende que el Consejo Ejecutivo abra los pliegos, á fin de que se examinen las boletas anuladas y se dé la victoria á quien la ganó en buena lid.

"Pasan días, semanas, meses.

"El 20 del actual se harán los nombramientos, conforme la mayoría que aparezca en los precintos de cada municipio desanexado.

"Y Toa-Baja tendrá un ayuntamiento republicano en vez de tener ¡¡como es justo!! un ayuntamiento unionista.

"El Ponente es Don José Conrado Hernández. Por la Ponencia se retarda la resolución del asunto. Y nosotros pedimos que, tratándose de algo urgentísimo que afecta á la vida de un pueblo, se

demuestre menos pasividad y se presente sin demora ese dictamen, y se abran esos pliegos, y se diga si son nulas ó son válidas las papeletas que se discuten.

"Es este nuestro primer toque de alerta.

"Ojalá que no se necesite el segundo."

Como en el mencionado artículo se afirmaba falsamente que este Tribunal Supremo no había despachado aún el recurso de *mandamus* ejercitado por el letrado Benítez Castaño contra el Consejo Ejecutivo, dióse vista al Fiscal de esta Corte á los fines procedentes, con arreglo á la Ley aprobada en 1 de marzo de 1902, definiendo el delito de desacato y disponiendo la pena correspondiente; y el Fiscal formuló acusación contra don Mariano Abril, Director del periódico "La Democracia", por estimar que semejante artículo constituye la publicación voluntaria de un informe falso de los procedimientos judiciales seguidos ante esta Corte Suprema en el referido caso de *mandamus,* el cual fué resuelto con toda la prontitud que reclamaran su naturaleza y el cumplimiento de los deberes oficiales del Tribunal, hecho comprendido en el número 5o. de la sección 1a. de la ley expresada.

Señalado día para la defensa del acusado don Mariano Abril, compareció éste asistido de su letrado don Juan Vías Ochoteco, y declaró que don Luis Muñoz Rivera, redactor del periódico, era el autor del artículo aludido, pero como director de dicho periódico era responsable del artículo por haber aparecido sin firma, alegando en su descargo que el expresado artículo no fué publicado con intención de ofender al Tribunal Supremo, sino de que se resolviese el *mandamus* lo más pronto posible, habiéndose publicado después de haberse quejado el abogado Benítez Castaño en la redacción de "La Democracia" de que el Tribunal no había resuelto el *mandamus.*

De las pruebas practicadas aparece que en el número 4041 del mismo periódico "La Democracia", correspondiente al día 25 de marzo último, el mencionado abogado

Benítez Castaño, en artículo bajo el epígrafe "Eleccio-
nes de Toa-Baja", autorizado con su firma, aseguró que
el Supremo no había resuelto aún el *mandamus* solicitado
contra el Consejo Ejecutivo, declarando Benítez Casta-
ño que varias veces preguntó en la Secretaría de la Cor-
te Suprema, al Oficial 1o. de la misma Don Eugenio Alva-
rez si se había resuelto el *mandamus,* á lo que contestó Al-
varez, que no creía se hubiera resuelto; sobre cuyo particu-
lar expresa Alvarez haber contestado á Castaño que no te-
nía noticias de que hubiera recaído resolución en el caso
de *mandamus,* asegurando el secretario de la Corte, don
Antonio F. Castro, que esa resolución se había dictado
desde el día 25 de febrero sin que Benítez Castaño hubie-
ra acudido donde él á enterarse de la misma.

Con tales antecedentes el Fiscal sostuvo su acusación
y el letrado de Abril alegó cuanto estimó conducente en
defensa del acusado, protestando que éste no había tenido
intención de ofender al Tribunal.

Según la Ley de la Asamblea Legislativa aprobada en
1o. de marzo de 1902, el delito de desacato á una corte ó
tribunal se comete, entre otros actos, que la misma ley
expresa en la sección 1a., por la voluntaria publicación
de cualquier informe falso ó groseramente inexacto de
procedimientos judiciales.

El informe publicado en el mismo número 4052 del pe-
riódico "La Democracia", correspondiente al día 7 de
Abril del corriente año, sobre los procedimientos del auto
de *mandamus* solicitado ante esta Corte Suprema por el
abogado Benítez Castaño es falso á todas luces, pues des-
de el 25 de febrero la Corte había resuelto ese caso decla-
rando no haber lugar á expedir el auto de *mandamus,* y
falso era consiguientemente que por culpa del Juez Po-
nente se retardara la resolución del asunto.

El artículo de "La Democracia" que motivó la acusa-
ción de Abril cae de lleno dentro del número 5o. de la Sec-
ción 1a. de la Ley de la Asamblea Legislativa aprobada

en 1o. de marzo de 1902, pues fué publicado en términos absolutos y categóricos, sin el menor asomo de duda respecto al curso del procedimiento de *mandamus,* y en esa forma obtuvo circulación propagando la noticia falsa de que esta Corte demoraba la resolución de un asunto sometido á su decisión.

Reconocemos el principio de todo gobierno libre de que los tribunales de justicia son creados y sostenidos, no para beneficio de los que desempeñan sus cargos, sino para beneficio de la sociedad y protección del pueblo en el disfrute de sus derechos; pero también entendemos que para realizar su alta misión necesitan ser respetados y estar libres de ataques injustos que inspiren desconfianza y recelos al público, que debe ver en ellos guardadores y defensores de sus derechos.

A ello no se opone la libertad de la prensa, pues una cosa es esa libertad y otra el abuso de la misma.

Empero, el tribunal debe abstenerse en el caso presente de imponer pena á don Mariano Abril, teniendo en cuenta que la publicación del artículo de que se trata fué motivada por informes falsos que suministrara el abogado Benítez Castaño, y que el mismo Abril ha protestado no haber sido su intención la de ofender al tribunal. Aconsejan también esa resolución el hecho de que el presente es el primer caso de desacato que se somete á la consideración de esta Corte, que el desacato cometido no reviste caracteres graves, y que siendo materia nueva en la legislación de esta isla, fácilmente ha podido creerse excusable lo que era ilegal. Y decimos esto, porque el periodista debe tener ciencia y conciencia de lo que publica, y no confiar cuando se trata de atacar á los tribunales en informes que no pueda justificar de manera cumplida ser verdaderos.

Por las razones expuestas, y tomando como precedente la resolución final de la Corte Suprema de Colorado, en el caso de "People of the State of Colorado ex rel. Chas

Connor. v. William Stapleton et al'', L. R. A. Vol. 23, página 787, somos de opinión que en el presente caso todo ulterior procedimiento es innecesario y que no debe aplicarse á don Mariano Abril castigo alguno.

*Absuelto.*

Jueces concurrentes: Sres. Presidente Quiñones y Asociados, Figueras y Wolf.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. MACLEARY.

No pudiendo estar de acuerdo con mis compañeros, en cuanto al procedimiento seguido en la presente causa, ni en cuanto al dictamen emitido ni fallo dictado en la misma, me veo obligado á consignar las razones que me impelen á discutir. Al hacer esto, será necesario considerar atentamente las proposiciones enunciadas en el dictamen, y las razones consignadas en el mismo, para justificar el proceder del Tribunal, puesto que en la sentencia se declara que esas proposiciones son la base de la resolución adoptada por la Corte, de sobreseer definitivamente en el procedimiento, sin imponer al acusado castigo alguno. Si fuese posible hacerlo así, yo preferiría exponer mis propias ideas sin hacer referencia á las expresadas en el dictamen de la mayoría del Tribunal; pero la manera en que estas materias se hallan consignadas, y la índole del caso, hacen del todo imposible este curso. Cualquiera referencia hecha á los pareceres, ó las medidas adoptadas por mis compañeros, se ha hecho con la intención de que sea enteramente impersonal.

La presente es una causa seguida por desacato contra Mariano Abril, Director del periódico llamado "La Democracia", cometido mediante una falsa publicación hecha en dicho periódico, en siete de abril de mil novecientos cinco. Dicho artículo, que apareció en el número 4,052, del tomo XV, con fecha siete de abril de mil novecientos cinco, dice lo siguiente:

"Lo de Toa-Baja.—Triunfo electoral evidente, quizás perdido por la calma del Tribunal Supremo.—YA ES TIEMPO.—El Recurso del abogado unionista duerme, porque la Ponencia no se despacha.

"Al Tribunal Supremo de Puerto Rico, que es la más alta representación de la Justicia en este país, consagró siempre LA DEMOCRACIA sus mayores respetos.

"Y seguirá consagrándoselos.

"Pero el Partido Unionista tiene intereses que defender á todo trance y la prensa unionista sería criminal si abandonara los intereses de su Partido.

"En Toa-Baja vencieron nuestros correligionarios por mayoría de votos. Y, en presencia de ese triunfo, nuestros adversarios acudieron á los más ridículos ardides, prevaliéndose de SU DOS POR UNO en las Juntas Electorales y anulando ciento ocho papeletas por la *simple,* simplísima razón de que las cruces no llegaban á la línea de los círculos que están al frente de las boletas.

"Aquella añagaza, tan burda y necia, no podía prevalecer. Y, el Señor Benítez Castaño presentó un recurso de *mandamus* ante el Supremo, del cual recurso depende que el Consejo Ejecutivo abra los pliegos, á fin de que se examinen las boletas anuladas y se dé la victoria á quien la ganó en buena lid.

"Pasan días, semanas, meses.

"El 20 del actual se harán los nombramientos, conforme la mayoría que aparezca en los precintos de cada municipio desanexado.

"Y Toa-Baja tendrá un ayuntamiento republicano en vez de tener ¡¡como es justo!! un ayuntamiento unionista.

"El Ponente es Don José Conrado Hernández. Por la Ponencia se retarda la resolución del asunto. Y nosotros pedimos que, tratándose de algo urgentísimo que afecta á la vida de un pueblo, se demuestre menos pasividad y se presente sin demora ese dictamen, y se abran esos pliegos, y se diga si son nulas ó son válidas las papeletas que se discuten.

"Es este nuestro primer toque de alerta.

"Ojalá que no se necesite el segundo"

El día ocho de abril del presente año, el Ponente, que había sido mencionado en el referido informe del periódico anteriormente citado, llamó la atención del Tribunal Supremo sobre dicho informe; y éste, entonces, dictó providencia, entregando el asunto al Fiscal, y ordenándole promoviera las diligencias dispuestas por la

ley. El once de abril el Fiscal del Tribunal Supremo, presentó contra el citado Mariano Abril, la siguiente acusación:

"En el nombre y por la autoridad de El Pueblo de Puerto Rico. —"El Pueblo de Puerto Rico contra Mariano Abril.—En la Corte Suprema de Puerto Rico.—Acta de acusación por desacato.

"El Fiscal de esta Corte Suprema formula acusación contra Mariano Abril, Director del periódico "La Democracia" por delito de desacato á esta Corte Suprema de Justicia, comprendido en el número cinco de la sección primera de la "Ley definiendo el delito de desacato y disponiendo la pena correspondiente," votada por la Asamblea Legislativa de Puerto Rico, aprobada en primero de marzo de 1902, cometido en la siguiente forma:

"En ó por el día cuatro de febrero de 1905, el abogado Eugenio Benítez, á nombre de Lucas Luis Vélez y otros, presentó ante esta Corte Suprema una solicitud de "mandamus" contra el Consejo Ejecutivo de Puerto Rico, para que se le ordenara á este cuerpo la apertura de ciertos paquetes de papeletas electorales que estaban en su poder, las cuales no habían sido depositadas, según el peticionario afirma, á favor del Partido "Unión de Puerto Rico", en la elección general celebrada el día ocho de Noviembre de 1904.

"Que el día nueve de febrero de 1905, se expidió por el Honorable Presidente de esta Corte, una orden al Consejo Ejecutivo de Puerto Rico, y en su representación, al Hon. Regis H. Post, como Presidente, para que expusiere en caso de que las hubiere, las causas por las cuales no debiera dictarse el auto de "mandamus" solicitado.

"Que en quince de febrero del propio año, el Assistant Attorney General y el Fiscal que suscribe, en representación del Consejo Ejecutivo, pedimos á la Corte que declarara sin lugar la anterior solicitud, por las razones que alegamos en escrito presentado con tal fin.

"Que con fecha 25 de febrero de 1905, la corte resolvió este caso, declarando no haber lugar á expedir el auto de "mandamus" solicitado, y cuya resolución, que está suscrita por los Honorables Jueces Quiñones, Hernández, MacLeary y Wolf, fué firme desde luego, y quedó en poder del Señor Secretario á disposición de todos los que quisieran enterarse de ella, como nos enteramos nosotros que éramos los abogados del Consejo Ejecutivo.

"Que no obstante esta resolución, en el número del periódico "La Democracia", que se edita en esta Ciudad, Isla de Puerto Rico, correspondiente al día siete de abril de mil novecientos cinco, del

cual aparece como director el citado Mariano Abril, y en su página 3a., bajo el epígrafe, "Lo de Toa-Baja, triunfo electoral evidente, quizás perdido por la calma del Tribunal Supremo.—Ya es tiempo.—El recurso del abogado unionista duerme porque la Ponencia no se despacha"; se publica un artículo del cual son los siguientes párrafos:

"Aquella añagaza, tan burda y necia, no podía prevalecer. Y, el señor Benítez Castaño presentó un recurso de *mandamus* ante el Supremo, del cual recurso depende que el Consejo Ejecutivo abra los pliegos, á fin de que se examinen las boletas anuladas y se dé la victoria á quien la ganó en buena lid.

"Pasan días, semanas, meses.

"El 20 del actual se harán los nombramientos, conforme la mayoría que aparezca en los precintos de cada municipio desanexado.

"Y Toa-Baja tendrá un ayuntamiento republicano en vez de tener ¡¡como es justo!! un ayuntamiento unionista.

"El Ponente es Don José Conrado Hernández. Por la Ponencia se retarda la resolución del asunto. Y nosotros pedimos que, tratándose de algo urgentísimo que afecta á la vida de un pueblo, se demuestre menos pasividad y se presente sin demora ese dictamen, y se abran esos pliegos, y se diga si son nulas ó son válidas las papeletas que se discuten.

"Es este nuestro primer toque de alerta.

"Ojalá que no se necesite el segundo."

"Que semejante artículo constituye la publicación voluntaria de un informe falso de los procedimientos judiciales seguidos ante esta Corte Suprema en el caso que nos ocupa, el cual fué resuelto con toda la prontitud que reclamaba su naturaleza y el cumplimiento de los deberes oficiales del Tribunal, siendo este hecho contrario á la ley para tal caso prevista, y á la paz y dignidad del "Pueblo de Puerto Rico." Firmado: Jesús M. Rossy, Fiscal del Tribunal Supremo.

"La acusación que antecede, está basada en el conocimiento personal que tiene de los hechos por la lectura del periódico de referencia, que me ha sido remitido por el Tribunal juntamente con la resolución, disponiendo que se proceda, con arreglo á la ley de la Asamblea Legislativa, aprobada en primero de marzo de 1902, "definiendo el delito de desacato, y disponiendo la pena correspondiente." Firmado: Jesús M. Rossy, Fiscal del Tribunal Supremo.

"Jurado y suscrito ante mí, hoy día 11 de abril de 1905.— Firmado: A. F. Castro, Secretario del Tribunal Supremo."

Abril dejó de presentar la contestación que se le había ordenado, y de exponer razones por qué no había de ser castigado por desacato, ni presentó ninguna otra defensa. Pero él compareció en el juicio oral de la causa, que tuvo lugar en 17 de abril, en Corte abierta, y declaró en unión de otros testigos. Porqué no se le exigió á Abril que presentase una contestación ó un pliego de excepciones á la acusación, es cosa de que no se ha enterado al exponente.

Y, además, hallándose en rebeldía el acusado, debía habérsele exigido prestar fianza para responder de su comparecencia diaria ante el Tribunal, hasta que hubiese quedado exento de tal obligación, por la decisión de este Tribunal. No se le exigió fianza mientras se hallaba pendiente la consideración de esta causa, que duró más de dos meses, y ni siquiera fué detenido en custodia nominal; y después de haberse sometido el asunto al Tribunal, y con anterioridad á su decisión, se ha tenido conocimiento general en esta ciudad y en la Isla, de que el acusado había salido de Puerto Rico, y emigrado al Continente; de manera que, aún en el caso de que la sentencia del Tribunal, hubiese sido contra él, él se hubiese encontrado fuera de la jurisdicción del mismo, y no hubiera podido ejecutarse la sentencia, sin extradición. Todos los procedimientos en esta causa, parecen haber sido conducidos de una manera muy vaga, acentuando esto el hecho de que el procedimiento en causas de esta clase, no está todavía bien establecido ó comprendido en esta jurisdicción. Yo no puedo comprender por qué se permitió esto. Estas circunstancias se mencionan solamente para demostrar que en las causas por desacato, debe adoptarse, ciertamente, sin más demora, alguna práctica definitiva.

En el acto del juicio, se hicieron las siguientes declaraciones, tomadas de los apuntes del taquígrafo, que en

el acto del juicio tomó las declaraciones por escrito, y, poco después, presentó su informe al Secretario del Tribunal. Un resumen exacto de las declaraciones de los testigos es como sigue:

"El Fiscal ofreció como prueba á favor del Pueblo, 1o.: El artículo en que se basa la acusación que ha sido copiado anteriormente, y 2o.: El testimonio de Antonio F. Castro, secretario del Tribunal, que se dió como sigue: Que se presentó en este Tribunal, por el abogado Benítez Castaño, un escrito solicitando un auto de *mandamus*; que dicho asunto fué resuelto en 25 de febrero del corriente año; que él ignora si vino el Sr. Benítez después del 25 de febrero del corriente año, para cerciorarse de cual fué la resolución recaída; que no se dirigió á él personalmente; que hay una decisión de este Tribunal, por la cual quedó abolida la práctica de notificar á las partes del resultado de sus asuntos; que la citada resolución y orden fué publicada, y remitida á los Tribunales de Distrito y Cortes Municipales, en donde fueron fijadas para conocimiento del público.

"En contestación á preguntas que le fueron dirigidas por la defensa, el testigo declaró que en dicha resolución se expresa que las partes deben pedir informes en la oficina del Secretario El letrado defensor propuso que el acusado fuese examinado como testigo, y también el señor Eugenio Benítez Castaño, y que el artículo del periódico de fecha 25 de marzo, fuese admitido como prueba.

"El Fiscal solicitó que se le autorizase para dirigir otra pregunta al Secretario, y éste, en contestación á dicha pregunta, dijo que no había recibido absolutamente ninguna queja de nadie acerca de que los empleados en su oficina, se hubieran negado á informar, ó hubieran informado inexactamente al Señor Benítez, ú otra persona interesada en este asunto, con respecto al estado del mismo.

"El señor Abril, después de haber sido enterado por el Tribunal de que no estaba obligado á declarar, pero que si así lo hiciere, sería bajo la responsabilidad del juramento que había prestado, y que su declaración podría utilizarse contra él en cualquier procedimiento que se le siguiera á él, ó á cualquiera otra persona, declaró que en siete de Abril, se publicó en "La Democracia" un artículo referente al auto de *mandamus* en cuestión; que dicho artículo fué publicado después de haberse quejado en la oficina de "La Democracia", el señor Benítez Castaño, respecto á que el *mandamus* no había sido resuelto, y que esta omisión perjudicaba sus intereses. Que ellos

habían tratado varias veces, de cerciorarse del estado del asunto, antes de mencionarlo en la prensa, y el artículo de fecha 25, fué publicado en "La Democracia," y en él se dijo que el auto de *mandamus* pendiente ante el Tribunal Supremo, no había sido resuelto; que más tarde fueron enterados por el Señor Benítez, de que el asunto no había sido despachado, y que fué entonces que se publicó el segundo artículo, en el que se pidió que dicho asunto fuera resuelto tan pronto como se pudiera; que no hubo la intención de ofender al Tribunal, sino que dicho artículo se publicó con el fin de que se resolviera el asunto tan prontamente como fuera posible. El acusado, además, declaró que él por sí mismo no había escrito el citado artículo, pero que él era el Director del periódico, y como tal, era responsable de cualquier publicación hecha en el mismo, sin firma; que el Señor Luis Muñoz Rivera, editor del periódico, era el autor del artículo.

"El señor Benítez Castaño, después de juramentado como testigo, declaró sustancialmente como sigue: que él había presentado un escrito, solicitando el auto de *mandamus,* ante este Tribunal; que después del 25 de Marzo, él había estado varias veces en la Oficina del Secretario, para preguntar acerca de la resolución; que no interrogó al Secretario personalmente, porque siempre lo encontraba en Corte, pero que preguntó varias veces al Señor Alvarez, y que éste le contestó que no sabía si se había resuelto el asunto; que en virtud de lo que el Señor Alvarez le había contestado, se publicó en 25 de marzo, el primer artículo en "La Democracia"; que el Señor Alvarez no expresó definitivamente que el caso no había sido resuelto, y que entonces él dió, en la redacción de "La Democracia," el informe de que, según su creencia, el asunto no se había resuelto.

"A preguntas del señor Juez Hernández, el señor Abril contestó que no había publicado en el periódico ninguna explicación ó rectificación después de haber sido notificado de la resolución del Tribunal Supremo, porque no se le había contestado con seguridad, acerca de dicha cuestión.

"El Tribunal ordenó que se diera lectura al artículo publicado en "La Democracia," con fecha 25 de marzo, y que fué admitido cómo prueba; dicho artículo es como sigue:

"Elecciones de Toa-Baja.—El Señor Benítez Castaños discute victoriosamente los acuerdos del Ejecutivo.—Textos legales.—Vergonzosa impunidad para los delitos políticos.

"Afirmamos antes que la Corte Suprema puede ordenar, y el Con-

sejo Ejecutivo puede verificar, la inspección del paquete de papeletas electorales ilegalmente rechazadas por los jueces republicanos en los precintos de Toa-Baja.

"No era facultad discrecional de dichos Jueces, el admitir ó rechazar aquellas papeletas. Tenían el deber imperioso, deber sujeto á regla, de contarlas como votos válidos. En este caso especialísimo, del que no hemos podido encontrar ejemplo exacto en las obras y textos americanos que hemos leído, no es posible exigir á los jueces de elección de Toa-Baja, que se reunan de nuevo y cuenten los votos que, por la mala fe de nuestros adversarios y su carencia absoluta de respeto al sufragio, se arrebataron al Partido Unión de Puerto Rico. No es posible pretender semejante cosa, porque las papeletas de referencia no están ya bajo el control de aquellos jueces. Están bajo la custodia del Consejo Ejecutivo. Este punto está claramente resuelto en la obra L. R. A. página 740.

"La finalidad del auto de *mandamus*, es impedir que la justicia fracase. (Wood sobre *mandamus* página 34). Y aquí fracasaría por completo la justicia si no acude á remediar el mal en la forma que pretenden las partes interesadas.

"En el caso de Ellis v. County Commissioners, decidióse que podía utilizarse el recurso de *mandamus*, á fin de hacer que una Junta de escrutinio certificara que el peticionario del auto obtuvo mayoría de votos para un cargo público, aunque ya el certificado de elección para tal cargo se había expedido á otra persona.

"Puede ordenarse á la Junta de Escrutinio del Estado, por medio de un *mandamus*, que rectifique el aparente resultado de la elección, dejando de contar votos ilegales que ya lo habían sido por la Junta del Condado. (L. R. A. libro 14, página 624.) Nosotros no queremos que se omita contar votos ilegales, sino que sé cuenten votos perfectamente válidos, pero la doctrina legal aplicable al caso es la misma.

"Cuando los documentos electorales contienen el resultado de un escrutinio ilegal y erróneo, hecho por una Junta de Condado, que se ha excedido en sus atribuciones y que ha infringido sus deberes, si tal resultado pudiese alterar la verdad de la elección, el *mandamus* es un remedio eficaz para que por la Junta de Escrutinio del Estado no se tenga en cuenta lo que aparezca de aquellos documentos, aunque ostensiblemente, sean propios y válidos. (L. R. A. libro 14, página 643.)

"Siempre que se trate del título ó derecho á un cargo público, el procedimiento legal usado generalmente es el *quo warranto*. En-

tonces no cabe el *mandamus,* salvo raras excepciones. Pero esto no es la cuestión que se debate. Ciertamente que, aclarado el asunto que nos ocupa, se establecerá, de modo definitivo, á quienes corresponden los cargos municipales de Toa-Baja: si á los unionistas ó á los republicanos.

"La petición de *mandamus* hecha, en la Corte Suprema, se apoya en la declaración jurada de los dos jueces de elección, que representaron al Partido Unión de Puerto Rico en los precintos de aquel pueblo. Esos jueces juran acerca de un hecho concreto: que nuestros adversarios dejaron de contar 108 papeletas legalmente votadas en favor de nuestro partido, porque la cruz, hecha en el círculo, no tocaba la línea de la circunferencia. Aquí se presenta, pues, un dilema: ó los jueces unionistas son perjuros, ó los jueces republicanos faltaron abiertamente á la ley. Las papeletas serán la prueba más elocuente. Urge que se examinen para que no prospere la mentira, para que no se sancione tácitamente un atropello al sufragio.

"Si se atiende á la justicia y al derecho, el caso es muy sencillo. Es susceptible de dificultarse la acción por tiquis miquis, tecnicismos de ley, y decisiones judiciales que no son uniformes, mas, si así sucediera, si no prosperase la petición de *mandamus,* no se crea, por un instante, que este asunto, en el cual palpita un gran fondo de rectitud y sinceridad por parte nuestra, ha de permanecer envuelto en sombras. La luz se hará de todos modos.

"En el debate judicial que hemos planteado, con motivo de las elecciones en Toa-Baja y otros pueblos, los tribunales no han dicho su última palabra. El Supremo no ha resuelto aún el *mandamus* solicitado contra el Consejo Ejecutivo. Aguardamos su decisión. El Attorney tampoco ha dictado resolución alguna sobre varias solicitudes de *quo warranto* que tenemos presentadas. También esperamos que decida. Y para estimularlo á ello, para lograr que no mire con la indiferencia de Mr. Sweet, reclamaciones que entrañan importancia tanta, interés tan vivo para el país puertorriqueño, excitaremos su celo por medio de cartas que verán la luz en este periódico.

"Si, por desgracia, se agotara estérilmente todo género de esfuerzos en pró de la pureza del sufragio y de la legalidad de las elecciones, obtendríamos el convencimiento triste de que los infractores de la ley, en momentos en que el ciudadano ejerce el voto, pueden contar con la impunidad más vergonzosa.—E. Benítez Castaño."

"Don Eugenio Alvarez, Secretario auxiliar de esta Corte Supre-

ma, fué examinado como testigo, y manifestó que había sido preguntado por el señor Benítez con respecto al auto de *mandamus,* agregando que el Señor Benítez se presentó en la Oficina, y como era su costumbre, se dirigió primeramente al Sr. Marín, quien á lo que parece, lo dirigió al Sr. Alvarez, y que al hacer eso, el señor Benítez preguntó que si se había resuelto el auto de *mandamus* contra el Consejo Ejecutivo, á cuya pregunta el testigo (Alvarez) contestó que no se le había enterado sobre si había ó no recaído una decisión, y que solamente tenía en su poder una copia de la contestación presentada por el Consejo Ejecutivo, la cual entregó al señor Benítez Castaño en aquel momento; que él no dijo definidamente al señor Benítez, que el asunto no había sido resuelto; que él puede ignorar una resolución dictada por el Tribunal, sin faltar al cumplimiento de sus deberes, porque muhas veces se entregan las decisiones directamente al Secretario, quien atiende á las mismas, en unión de los empleados de la Oficina; y en tales casos, él no se puede enterar de la resolución recaída hasta que no se le entrega copia de la misma, para unirla al expediente, y comunicarla á los Tribunales de Distrito; que después del Secretario, él es el empleado más antiguo, y el que le sigue en autoridad en la Secretaría del Tribunal Supremo.''

Con esto terminan las declaraciones hechas en el acto del juicio. El Tribunal se ocupó del asunto, y continuó, en intervalos, la consideración del mismo, de día en día, desde el diez y siete de abril, hasta el veinte de junio del presente año, dictando entonces una orden, sobreseyendo definitivamente en el procedimiento seguido contra el acusado Abril, sin imponerle castigo alguno, por las razones expresadas en el dictamen que se presentó al mismo tiempo.

Con una parte del dictamen del Tribunal, redactado por el Juez Hernández, estoy enteramente conforme; es decir, con los párrafos siguientes:

''Según la Ley de la Asamblea Legislativa, aprobada en primero de marzo de 1902, el delito de desacato á una Corte ó Tribunal, se comete, entre otros actos que la misma ley expresa en la Sección primera, por la voluntaria publicación de cualquier informe falso ó groseramente inexacto, de procedimientos judiciales.

"El informe publicado en el mismo número 4052 del periódico "La Democracia", correspondiente al día siete de abril del corriente año, sobre los procedimientos del auto de *mandamus* solicitado ante esta Corte Suprema, por el abogado Benítez Castaño, es falso á todas luces, pues desde el 25 de febrero, la Corte había resuelto ese caso, declarando no haber lugar á expedir el auto de *mandamus*, y falso era consiguientemente, que por culpa del Juez Ponente, se retardara la resolución del asunto.

"El artículo de "La Democracia", que motivó la acusación de Abril, cae de lleno dentro del número 5 de la Sección primera de la Ley de la Asamblea Legislativa aprobada en primero de marzo de 1902, pues fué publicado en términos absolutos y categóricos, sin el menor asomo de duda respecto al curso del procedimiento de *mandamus*, y en esa forma, obtuvo circulación, propagando la noticia falsa de que esta Corte demoraba la resolución de un asunto sometido á su decisión.

"Reconocemos el principio de todo gobierno libre, de que los Tribunales de Justicia son creados y sostenidos, no para beneficio de los que desempeñan sus cargos, sino para beneficio de la sociedad, y protección del pueblo en el disfrute de sus derechos; pero también entendemos que para realizar su alta misión, necesitan ser respetados, y estar libres de ataques injustos que inspiren desconfianza y recelos al público, que debe ver en ellos, guardadores y defensores de sus derechos.

"A ello no se opone la libertad de prensa, pues una cosa es esa libertad, y otra el abuso de la misma."

Pero yo no puedo estar de acuerdo con la conclusión á que ha llegado el Tribunal, por estas premisas, á saber: que el Tribunal debe abstenerse de imponer pena alguna á Mariano Abril. Las razones alegadas por el Tribunal, para excusar al acusado, son: Primero: Que la publicación del artículo de referencia, había sido causada por el informe falso dado por el abogado Benítez Castaño; Segundo: que el mismo Abril protestó que no tuvo la intención de ofender al Tribunal; Tercero: que éste es el primer caso original de desacato, que ha sido sometido á este Tribunal para su consideración; Cuarto: que el desacato cometido no reviste características graves; y

Quinto: que siendo el referido delito materia nueva en la legislación de esta isla, era fácil creer excusable lo que era ilegal.

La primera de estas excusas, queda contestada por el mismo dictamen, que inmediatamente después de las expresiones mencionadas, continúa diciendo: "Que el hecho era ilegal, porque el periodista debe tener ciencia y conciencia de lo que publica, y no confiar, cuando se trata de atacar á los tribunales, en informe que no puede justificar de manera cumplida ser verdaderos." Ciertamente, si esta exposición es correcta,—y yo estoy completamente de acuerdo con ella—no puede considerarse el informe falso, dado por el abogado, como justificante del artículo. Y aún aparte de la razón alegada, Benítez Castaño, al dar este informe, obró como agente del acusado, y por supuesto, este último, es responsable de cualesquiera errores incurridos ó relaciones no exactas dadas por su dicho agente. Al confiar en manifestaciones hechas por otros, lo hace á su riesgo. El archivo de este Tribunal es público, y él tenía derecho á examinarlo, si así lo hubiese deseado. El hubiese podido conferenciar con el Secretario en su oficina, ó por teléfono, y fácilmente se hubiese cerciorado de los hechos referentes al asunto en cuestión. El no se molestó para buscar la verdad. Ignorancia intencional, no puede justificar una grosera falsedad. En causas por desacato, ni la ignorancia de la Ley, ni la de los hechos, es una excusa del delito; siendo la razón para el castigo, en tales casos, no solamente la consideración de la parte ofendida, sino también la de los procedimientos públicos en el Tribunal; y siendo uno de los objetos principales del castigo, el de impedir tales publicaciones, que tienen tendencia á prevenir la opinión pública con respecto á asuntos que se hallan sometidos á la consideración de los tribunales judiciales.

Véanse las decisiones de las causas relatadas en *English Chancery Reports.* (2 *Atyns* 471, 2 *Vesey*, 520, 1 *Peere Wms.* 675) y aprobadas por nuestros autores; 4 *Blackstone's comentaries,* 282; *Republic v. Osvald* 1, U. S. (*Dallas*) 329 b.)

La segunda excusa no se funda en ningún hecho. Abril, en el presente caso, no presentó contestación alguna bajo juramento, ni en otra forma, ni formuló protesta por escrito ni oralmente. El simplemente manifestó en la declaración que hizo, en contestación á las preguntas de su abogado, que él no tuvo la intención de ofender al tribunal, sino que su objeto fué conseguir una decisión tan pronto como fuera posible. Esta manifestación es esencialmente diferente del artículo mismo.

El Tribunal Supremo de los Estados Unidos, ha enunciado la proposición que ya estaba bien establecida, de que los procedimientos por desacato, no se promueven en cumplimiento de las leyes penales del país; que las penas impuestas en los mismos, no son una sustitución de una causa seguida por algún delito, cometido al incurrir en las penas del desacato al tribunal, ni una defensa contra tal causa. Ambos procedimientos son completamente distintos. (*In re Debs;* 158 U. S. 564.)

En esta célebre causa, el Juez Brewer, en la página 596, dice además:

"Un Tribunal que mediante procedimientos por desacato, hace que se obedezcan sus órdenes, no se halla ejecutando las leyes penales del país, sino está solamente asegurando á los litigantes, los derechos que les ha adjudicado."

En apoyo de esta proposición, dicho Juez hace referencia á las causas siguientes, de algunas de las cuales se han hecho citas en su dictamen, á saber:

The Earl of Shafteebury's case; 2 St. Trials 615.
Watson v. Williams; 36 Miss. 331.
Cartwright's case; 114 Mass. 230.
United States v. Hudson, 7 Cranch 32.
Anderson v. Dunn; 6 Wheaton 204.

Robinson ex parte; 19 Wallace 505.

Mugler v. Kansas; 123 U. S. 623.

Eilenbecker v. Plymouth County 134 U. S. 31.

Interstate Com. Comn. v. Brimson 154 U. S. 447.

Terry ex parte; 128 U. S. 289.

No importa cuales eran las intenciones del acusado. No es necesario en un caso de esta clase, que el acusado haya tenido una intención criminal. El artículo II del Código Penal de Puerto Rico, no tiene aplicación alguna á este procedimiento, ni á otro que sea como éste. El acusado no está contestando á una acusación por un delito, ni es esta una causa seguida por un crimen. La Ley dispone que el castigo por desacato, no impide que el delincuente sea perseguido y castigado por el delito mismo, comprendido en el desacato. Estatutos Revisados de Puerto Rico, artículo 146, página 88. Si el desacato fuese un crimen, el acusado no podría ser castigado de nuevo por el mismo hecho; pero el desacato no es considerado como tal, por las leyes de esta Isla, ni por las de los Estados Unidos.

La simple denegación de toda intención ó propósito criminal é irrespetuoso, en publicar un artículo como el presente, que censura la conducta del tribunal en la decisión de una causa, no justifica ni puede justificar al acusado, en una publicación de esta índole. El Canciller Kent, ese gran maestro de jurisprudencia, al considerar este asunto, observa "que la denegación de toda mala intención, no hará desaparecer la perniciosa tendencia ó efecto de publicaciones que censuran los procedimientos judiciales pendientes ante nosotros." (*People v. Freer* 1 *Caines,* N. Y. 519.)

El sentido de la publicación, y la intención del acusado, deben determinarse mediante una justa interpretación del lenguaje empleado. (*People* v. *Wilson,* 16 Am. Rep. 532 & 537.)

Si el acusado dejó de contestar y alegar, bajo jura-

mento, algún motivo por qué no había de castigársele por desacato, el Tribunal, habiendo decidido que la publicación constituía un desacato, estaba impedido de seguir otro curso que no fuera el de castigarlo. La rebeldía impidió el que persona alguna alegase excusas á su favor. (*Wartman* v. *Wartman;* Taney U. S. Dec. 369. *Carter* v. *Commonwealth,* 96 Va. 791; 45 L. R. A. 310.)

Si Abril hubiese comparecido ante el Tribunal con una contestación jurada, como debió habérsele exigido, y si en dicha contestación, hubiese manifestado que él había sufrido un error y que el artículo se había escrito de buena fe, confiando él en informes que en esa época creía ser ciertos, pero que más tarde supo eran falsos; y si en dicha contestación, se hubiese excusado ante el Tribunal, del desacato cometido, y hubiese solicitado clemencia y ofrecido publicar su excusa en su periódico, con la misma prominencia con que había publicado el artículo original, entonces este caso hubiese podido tener alguna semejanza con el citado por el Tribunal en su dictamen, ó sea, la causa de The People of the State of Colorado Rel. Chas. Connor v. William Stapleton et al. 23 L. R. A. p. 137, y de acuerdo con aquél, pudiera haber habido algún motivo para que el Tribunal hubiese impuesto una pena leve, ó hubiese excusado el delito del todo; pero según las circunstancias y las declaraciones de los testigos, tales como se presentan en este caso, según los autos, no hay motivo alguno para clemencia, ni siquiera, y mucho menos para una completa excusa.

En cuanto al tercer motivo alegado por el Tribunal, para justificar su proceder, de que éste es el primer caso de desacato que se ha presentado originalmente ante este Tribunal, me parece á mí, que este hecho, más bien indica que debe imponerse un castigo severo para impedir que se presenten otros casos ante este Tribunal; y para desanimar á otros delincuentes á cometer semejan-

tes actos, que son reprensibles por su naturaleza, y conducentes á desórdenes é irreverencias contra los Tribunales de Puerto Rico, y á la paralización del mecanismo de la justicia pública. Si se desatiende, ó disimula ó excusa completamente el primer caso que se presenta, como sucede en el asunto actualmente en consideración, entonces podemos esperar que el segundo, el tercero, y muchos otros, seguirán en rápida sucesión. El que éste sea el primer caso de esta clase, que se presenta á la Corte, en el ejercicio de su jurisdicción original, no indica en manera alguna que éste sea el primer desacato de esta índole, que se haya cometido en esta Isla durante los últimos siete años; al contrario, otros han llegado á este Tribunal, en apelación y con motivo de *habeas corpus;* y cualquiera persona que lea los periódicos, verá que tales sucesos tienen lugar casi diariamente, y que, algunos miembros de la prensa de esta Isla, se han desenfrenado con la libertad que suponen haber sido concedida á la prensa, por la primera enmienda á la Constitución de los Estados Unidos, y han confundido la libertad de que goza, bajo la bandera de la libertad, con la licencia de atacar con libelos á cualesquiera persona que incurra en su enemistad, y de criticar funcionarios públicos, judiciales y otros, según su propia inclinación. Hay que hacer una gran distinción entre libertad y licencia. El Juez Thernten, de la Corte Suprema de Illinois, al hablar de la facultad de los Tribunales, para castigar por desacatos, en una causa importante, decidida por aquel eminente Tribunal, en el año 1872, dice:

"Dicha facultad no es una restricción del privilegio asegurado á cada ciudadano en el "Bill of Rights" (una de las leyes fundamentales de Inglaterra adoptada en los Estados Unidos, que trata de los derechos de los ciudadanos), en virtud del cual toda persona puede hablar, escribir y publicar artículos sobre toda clase de asuntos, siendo, sin embargo, responsable del abuso de dicha libertad."

"Dichos derechos tienen límites bien definidos. Ellos son correlativos, y deben respetar á otros derechos. Ellos no son independientes de toda inspección. Aún la misma libertad no existe sin ser autorizada, si no se' halla regulada por la Ley. La prensa puede ser libre en el sentido más amplio de la palabra, sin que tenga un carácter denigrante, ó licencia para difamar. Toda persona puede hablar y escribir libremente, sin necesidad de recurrir á calumnias ó injurias. Todos los ramos del gobierno pueden ser libremente examinados, sin que se formulen falsas acusaciones de crímenes, y cargos injustos contra aquellas personas que ocupen puestos de confianza. No hay que temer nunca la verdad, y ésta se podrá siempre decir y escribir; pero la expresión de una intencional y premeditada falsedad, por más que sea disfrazada con buenas intenciones, es peligrosa y cobarde, y merece castigo y reprobación. Tal expresión es un abuso de los derechos garantizados por la Constitución." (*The People* v. *Wilson,* 16 Am. Rep. 546 & 547.)

El texto citado no podría ser más aplicable al caso de que se trata, si hubiese sido escrito por un miembro de nuestro propio tribunal, después de haber oído el juicio del acusado, en diez y siete del mes de abril. Un estudio de la causa de Wilson, sería una ocupación provechosa para los directores de periódicos, y los abogados que se encargan de aconsejarles.

El cuarto motivo alegado para justificar la absolución, ó sea el de que el desacato no reviste graves características, ciertamente no está basado en los autos. El artículo publicado es una completa falsedad. Dicho artículo acusa á este Tribunal, y especialmente al honorable ponente, el señor Juez Hernández, de haber cometido una injusticia contra la parte que se queja (en el citado artículo), y el partido Unionista en Toa-Baja, por una demora innecesaria é intencional.

Y, además, el artículo concluye con un dictado y una amenaza, redactados en estas notables palabras:

"Y nosotros pedimos que tratándose de algo urgentísimo, que afecta á la vida de un pueblo, se demuestre menos pasividad y se presente

sin demora, ese dictamen, y se abran esos pliegos, y se diga si son nulas ó son válidas las papeletas que se discuten.

"Este es nuestro primer toque de alerta.

"Ojalá que no se necesite el segundo."

El autor no indica, ni peticiona, ni suplica, ni ruega, sino que pide que el Tribunal despache el asunto, pendiente ante él, y no solamente pide que se apresure la resolución de dicho asunto, sino que dicta la forma en que el Tribunal ha de resolver la cuestión; y él ordena que se abran los paquetes, y que se declare si las papeletas son nulas ó son válidas. El concluye las exigencias hechas á este Tribunal, diciendo que este es el primer toque de alerta, lo cual es una amenaza, é indica que seguirá una segunda denunciación más severa, si no se atiende á la primera.

Es difícil imaginarse un abuso más arrogante y notorio de la libertad de la prensa; es difícil concebir una amenaza más manifiesta, atrevida ó ignominiosa contra este Tribunal. Por consiguiente, yo no puedo estar de acuerdo con la opinión de que el desacato cometido, no revista graves características. Al contrario, parece ser de un carácter muy grave, y merece un castigo correspondiente.

El quinto motivo alegado por el Tribunal, para justificar la notable indulgencia demostrada en esta causa, es que dicho delito es materia nueva en la Legislación de esta Isla; y que lo que es ilegal pueda fácilmente creerse excusable. Puede que sea verdad, que bajo el régimen español, los Tribunales no hayan tenido la facultad de protegerse contra la injuria y el vilipendio demostrados por publicaciones hechas en periódicos, ó cometidos por abogados y otras personas, mediante el uso del procedimiento conocido con el nombre de "procedimiento por desacato"; ciertamente, los Tribunales no estaban tan independientes y libres de restricción ejercida por parte de la autoridad ejecutiva, como lo están

bajo el sistema americano; pero es inútil decir ó insi-
nuar, que delitos como el presente, por parte de los pe-
riódicos, hubiesen sido tolerados ó quedado impunes ba-
jo la dominación española. Bajo las leyes civiles espa-
ñolas, se había previsto un castigo adecuado para deli-
tos de esta índole, y una mirada al Código Penal de Puer-
to Rico, vigente bajo la dominación española, y no de-
rogado hasta hace tres años, nos demuestra en el título
tercero, capítulo quinto, el castigo previsto por desaca-
tos á la autoridad. (Véase el Código Penal, arts. 262 á
266), cuyo castigo es prisión desde un mes hasta 6 años,
y multa de 65 dollars hasta 650. Un hecho como el pre-
sente, caería claramente dentro de la clasificación de
los delitos enumerados en el Capítulo quinto. Siendo
esto así ¿qué se hace la quinta excusa alegada á favor
del delincuente? Se revienta como una bomba de es-
puma de jabón, y se desvanece. Ciertamente, no parece
que el publicador de una falsedad como ésta, debía ser
excusado por el motivo de que dicho delito es materia
nueva en la Legislación de esta Isla. Es verdad que
el castigo ha sido mitigado, y que se ha cambiado el mé-
todo de aplicarlo, y que una libertad sin ejemplo, bajo
la autoridad de un monarca español, ha sido concedida
á todo escritorcillo que pueda disponer de suficiente di-
nero para comprar una cubada de caracteres de im-
prenta, y contratar un cajista; pero esto no es un moti-
vo para que se hagan efectivas las restricciones impues-
tas por las leyes americanas, á la libertad de la prensa.
Dichas leyes hacen á la prensa, y á sus propietarios, es-
trictamente responsables del abuso de la libertad que
les concede la Constitución. Véase la causa de People
v. Wilson, y otras autoridades citadas anteriormente.

La ley, con arreglo á la cual se siguió este procedi-
miento, dispone el castigo de desacato como el presente,
mediante prisión que no exceda de un período de trein-

ta días, y una multa que no exceda de doscientos dollars, ó ambas penas, ó sea la multa y la prisión, á discreción del tribunal. Evidentemente, la autoridad legislativa no consideró tal violación de la ley como un asunto leve, y al dejar el castigo á discreción del tribunal, no fué la intención de que tal discreción había de ser afectada por simpatía ó compasión, ú otros motivos de esta índole, sino que había de ser una sana discreción judicial, fijando el castigo de acuerdo con la enormidad del delito.

El Juez Keith, de la Corte Suprema de Virginia, en un dictamen bien considerado, dice:

"Un Juez, al defender la dignidad y la autoridad del Tribunal que preside, está cumpliendo con un sagrado deber, que debe á su carácter oficial, y no se halla ocupado en una controversia personal y privada." (*Carter* v. *Com.*, 96 Va. 791; 45 L. R. A. 314.)

Según todas las autoridades que se hallan á nuestro alcance en los tribunales americanos, debe castigarse al violador de las leyes, en casos de esta índole, y sostenerse la dignidad del Tribunal.

El respeto que debe demostrarse á los tribunales y jueces, no solamente por los abogados, sino también por la prensa, no se exige en obsequio del individuo que ocupa el puesto judicial, sino por consideración al cargo mismo. Cualquiera que sea la opinión de alguna persona, con respecto al individuo que ocupe el puesto de juez, nunca debe negar su respeto al cargo judicial, y sus funciones, ni expresar indebidamente irreverencia alguna. Un juez está impedido por el decoro y la dignidad de su puesto judicial de defenderse en tribunales, ó de otra manera, contra irrazonables críticas de su conducta oficial, por mucho que tales difamaciones tiendan á menoscabar la confianza en la administración de justicia, de que tan justamente se ha dicho que ella es el objeto principal de todo gobierno. Por esta razón, la prensa y los abogados debían de abstenerse de una crítica inmoderada de la conducta de los jueces, excepto cuando los actos judicia-

les se hallen sometidos al examen de un Tribunal superior, ó cuando se esté juzgando á un Juez, para determinar su destitución. Todo el pueblo, incluso los abogados y la prensa, está interesado en sostener el debido respeto á los Tribunales de Justicia en la administración de sus elevadas funciones. Aunque en el presente caso no sea necesario hacer más referencias á autoridades, ni citas de las mismas, unos breves extractos de algunas de las numerosas decisiones que se encuentran en las relaciones de las causas falladas por los tribunales americanos más altos, podrán ser útiles en la investigación de los futuros casos que están llamados á surgir en Puerto Rico. La unanimidad de opinión entre los juristas y comentaristas americanos, con respecto á esta cuestión, es tan notable como lo es la manera franca en que expresan sus opiniones.

El Tribunal Supremo de West Virginia (Virginia Occidental), después de haber examinado un gran número de autoridades con respecto á la cuestión de desacato á un Tribunal, y después de haber hecho una cita de un pasaje del dictamen emitido en la causa de Watson v. Williams, resuelta por el Tribunal Supremo de Mississippi, y relatada en 36 Miss. 331, dice:

"El derecho de castigar desacatos mediante una convicción sumaria, es un atributo necesario del poder judicial, inherentes á todos los Tribunales de Justicia, con motivo de la misma naturaleza de su organización, y es esencial para su existencia y protección, y para la debida administración de justicia. Dicho derecho es una prenda que se ha confiado á los Tribunales, no para beneficio de ellos mismos, sino para el beneficio del pueblo, cuyas leyes ellos hacen cumplir, y cuya autoridad ejercen; y cada Tribunal tiene por sí, la facultad de juzgar y castigar definitivamente los desacatos, sin la intervención de ningún otro Tribunal. El derecho de castigar por desacato, comprende no solamente los actos que directa y manifiestamente se opongan á las facultades de los Tribunales, ó insulten las personas de los Jueces, sino también los desacatos indirectos y deducidos, ó sea, los actos considerados como desaca-

tos· por deducción, que obstruyan el proceso, y degraden la auto-
ridad del Tribunal.'' (*State v.·Frew*, 49 Am. Rep. 261).

Y el mismo Tribunal cita, con aprobación un dictámen
del Tribunal Supremo de Illinois, que trata del mismo
asunto, y cuyo dictamen es como sigue:

''En la causa de People v. Wilson, 64 Ill. 195, se declaró que la
facultad para castigar por desacatos, es incidental á todos los Tri-
bunales de Justicia, independientemente de las disposiciones lega-
les; que la ley que declara que el Tribunal Supremo tendrá la facul-
tad de castigar desacatos cometidos por alguna persona mientras
esté celebrando audiencia dicho tribunal, simplemente confirma
una facultad.preexistente, y no trata de limitar el ejercicio de la
misma, á los desacatos que se cometan en presencia del Tribunal;
sino que deja á éste la determinación de los mismos, con arreglo á
los principios de la ley común. Y si alguna ley fuese considerada
como una limitación del poder del Tribunal, para castigar por cua·
lesquiera otros desacatos que los cometidos en su presencia, sin
embargo, en ese poder se hallarían necesariamente comprendidos
todos los actos cometidos con la intención de impedir, embarazar
ú obstruir al Tribunal en la administración de justicia. Tales actos
se considerarán como cometidos en la presencia del Tribunal. Y
el Tribunal Supremo de Illinois, en aquel caso, castigó, mediante
detención, al publicador y editor de un periódico, por haber publi-
cado en una ciudad del Estado, que se hallaba á gran distancia del
lugar donde el Tribunal estaba celebrando sus sesiones, una acu-
sación de soborno contra dicho Tribunal, con motivo de su proceder
en una causa que se hallaba pendiente ante el mismo, en virtud de
recurso de casación interpuesto por quebrantamiento de forma é
infracción de ley.'' *State* v. *Frew*, 49 Am. Rep. 269.)

Y, finalmente, dicho ilustrado Tribunal recapitula la
discusión en estos términos:

''Los Tribunales deben tener un poder que sea estrictamente su-.
ficiente, y ellos lo ejercerán para su propia protección, y no nece-
sitan ni piden más. Si la Legislatura ha dejado ó no, en su regu-
lación, una facultad bastante para ese fin, de éste, el Tribunal lla-
mado á ejercer dicha facultad, debe ser el único Juez, á no ser que
su sentencia se. halle sujeta á revisión, y en ese caso, el Tribunal
de última instancia sería el exclusivo Juez. No hay en los Tribu-

nales una inclinación para buscar ocasiones para ejercer este poder; y éste no se ejercerá á menos que exista una necesidad para ello.  Cuando un Juez tiene presente que no tiene el derecho de vengar de esta manera agravios personales, sino solamente injurias inferidas al Tribunal, al Tribunal del Pueblo, entonces el castigo viene á ser un grave é inflexible deber, bajo su juramento oficial.  Porque él sabe muy bien, que puesto que el armiño (la toga) estaba sin mancha cuando él se la puso sobre sus hombros, el Pueblo espera que así lo trasmita á su sucesor." (*State* v. *Frew*, Am. Rep. 274.)

El Tribunal Supremo de Iowa es de la misma opinión, según queda demostrado por la siguiente cita, tomada de un esmerado dictamen emitido en la causa de Henry v. Ellis; 49 Iowa, 205:

"En un procedimiento seguido para castigar un desacato cometido mediante publicaciones, alegadas de ser falsas, escandalosas y difamatorias, son admisibles las pruebas que demuestren el sentido de las publicaciones, y la intención con que fueron hechas.  Pero la mejor opinión parece ser la de que una buena intención no es una justificación de publicaciones que censuren procedimientos judiciales pendientes ante algún Tribunal.  Tal intención podrá mitigar el castigo, pero no excusa el delito.  El sentido de un artículo publicado y la intención de su autor, deben ser determinados mediante una justa interpretación del texto de dicho artículo, y si éste constituye ó no, desacato, es una cuestión de ley que debe resolver el Tribunal; y ninguna denegación de irreverencia intencional hacia el Tribunal, por parte de los publicadores, es un motivo suficiente para anular una orden por la que se les exigía, alegar razones por qué no se había de expedir una orden para su sujeción ó custodia.  Pero los Tribunales son indulgentes, y no están inclinados á adoptar medidas extremas para esta clase de desacatos.  Si la publicación apenas constituye un desacato criminal, ó aunque el publicador haya comentado en severos y oprobiosos términos, los procedimientos judiciales pendientes, si él comparece y niega toda falta de respeto hacia el Tribunal ó sus funcionarios, ó el jurado, los Abogados de las partes, etc., y afirma que no tuvo la intención de obstruir el debido curso de la Justicia, excusándose humildemente, el Tribunal raras veces hará más que reprenderle, é imponerle costas, ó repartir éstas á su discreción.  Pero á veces el publicador es multado, y aún puede ser que se le ponga preso."

Véase la nota en la causa de *State* v. *Galloway,* 98 Am. Dec. 418.

En cuanto á la facultad inherente á los Tribunales, para castigar actos cometidos en desprecio de su autoridad, se puede afirmar, sin vacilación, que dicha facultad, sin duda, existe, sujeta á ser limitada é inspeccionada por la misma autoridad, ya sea constitucional ó ya estatutoria, por la cual los tribunales mismos fueron constituídos. Por supuesto, en cuanto concierne á este Tribunal, dicha autoridad es del Congreso de los Estados Unidos. Entre las muchas autoridades que sostienen esta proposición, se podrá hacer referencia á las que se mencionan y citan á continuación, como sigue:

Se ha dicho por una autoridad muy eminente, á saber, el Tribunal Supremo de Ohio, en fecha tan reciente como lo es el año 1896,

"Se ha declarado en casos bien estudiados, que la Legislatura no es competente para reducir el poder de los Tribunales, de castigar sumariamente los actos inicuos que obstruyen la administración de la justicia. Esa conclusión es una necesaria inferencia de los numerosísimos casos en que se ha declarado que dicho poder es inherente á los Tribunales, independientemente de la autoridad legislativa. Una facultad que la Legislatura no ha conferido, no la puede quitar. Si "poder", distinguido de "jurisdicción," existe independientemente de la Legislación, entonces continuará existiendo no obstante la Legislación. De entre los numerosos casos en que se sostienen estas ideas, se han escogido los siguientes, por el esmerado examen de las autoridades, ó por la clara y vigorosa expresión de los principios de que se trata: State v. Frew, 24 W. Va. 416; 49 Am. Rep. 257; Little v. State 90 Ind. 338, 48 Am. Rep. 224; Yates v. Lansing, 5 John's, 282; State v. Morrill, 16 Ark. 384; Arnold v. Com. 80 Ky. 300, 44 Am. Rep. 480; People v. Wilson, 64 Ill. 195, 16 Am. Rep. 528; Re Woolley, 11 Bush, 95; United States v. Hudson, 11 U. S. 7 Cranch, 32 3 L. ed. 259; Watson v. Wiliams, 36 Miss, 331; Darby's case, 3 Wheel. C. C. 1; Neel v. State, 9 Ark. 259, 50 Am. Dec. 209; State v. Mathews, 37 N. H. 450; Cartwright's case, 114 Mass. 230."

Hale v. State 36 L. R. A. 259, 260.

El Juez Patterson, hablando en nombre del Tribunal Supremo de California, en la causa de Shortridge, cuya resolución es la más reciente de dicho tribunal, con respecto á esta materia, que tenemos á la vista, dice lo siguiente:

"No se ha encontrado autoridad alguna que deniege el derecho inherente á un Tribunal cuando no exista una limitación impuesta al mismo, por el poder que lo creó, para castigar, como desacato, un acto cometido en ó fuera de su presencia, y que tienda á impedir, embarazar ó obstruir al Tribunal en el desempeño de sus deberes. Es doctrina que ha sido admitida en todo su rigor, universalmente por los Tribunales americanos, y no tiene necesidad del apoyo de autoridades extranjeras, basado en la ficción de que la Magestad del Rey, representada por las personas de los Jueces, se halla siempre presente en el Tribunal. Dicha doctrina, está fundada en el principio,—que es contemporáneo con la existencia de los Tribunales,—y tan necesario como el derecho de la defensa propia de que dicho derecho es un incidente necesario para el ejercicio de los poderes conferidos al Tribunal, y que tal derecho es necesario para mantener su dignidad, si nó su misma existencia. Dicho derecho existe independientemente de la ley. El departamento legislativo podrá regular el procedimiento, y ampliar dicho poder; pero no puede restringir el poder mismo, sin usurpar los poderes constitucionales del Tribunal, y destruir la autonomía de ese sistema de restricción y regulación mutua, que es uno de los rasgos principales de nuestra forma de gobierno de tres poderes. En Arkansas, la Legislatura sancionó el poder del Tribunal para castigar, como desacatos, ciertos actos enumerados, y no otros. El Tribunal declaró que la sanción era meramente afirmativa de la Ley común, y que la cláusula prohibitoria merecía respeto como una opinión de un ramo co-ordinario del gobierno; pero que no era obligatoria para los Tribunales. (*State* v. *Morrill*, 16 Ark. 384.) Esta decisión está de acuerdo con todas las autoridades. Aunque dicho poder es necesariamente un poder altamente arbitrario, ha sido ejercitado por los Tribunales, á lo menos en este país, como un medio auxiliar para lograr los fines de la Justicia. Si los Jueces han abusado de dicho poder, tal cosa ha sucedido solamente en rarísimos casos. Nadie mejor que los mismos Jueces, ha comprendido el hecho de que un Tribunal, no puede compeler al pueblo á que le respete á sí mismo, ó á sus decisiones; y la misma delicadeza del referido poder, ha

resultado ser una salvaguardia contra su abuso. Solo á esta circunstancia debe atribuirse el hecho de que, aunque el referido poder inherente ha sido reclamado y ejercitado por los Tribunales de este país, desde la organización del gobierno, los autores de las constituciones en todos los Estados de la Unión, á excepción de Georgia y Luisiana, han juzgado innecesario imponer restricciones al poder de sus Tribunales, para castigar por desacatos. Stimson Am. Stat. Law Section 528.'' (*In Re Shortridge*, 21 L. R. A. 765.)

Volviendo á la causa contra Frew, el Tribunal Supremo de West Virginia, sigue descutiendo la cuestión detenidamente como sigue:

''Se admite aquí en el alegato, que la Legislatura no tiene la facultad de quitar á los Tribunales el poder inherente, poseído por los mismos, para castigar desacatos en la presencia de los Tribunales. Pero se insiste en que la Legislatura puede, á su voluntad, privar á los Tribunales, del poder de castigar sumariamente desacatos inherentes (actos considerados como desacatos por interpretación ó deducción) tales como el desacato definido en el fallo. En la Ley común, según claramente aparece de la causa de Dandridge, la facutad para castigar por tales desacatos indirectos, era un poder inherente—por ser un poder necesario—tanto como el de castigar por desacatos directos; y según hemos visto, este parecer está sobradamente sostenido por las autoridades. ¿No existe la razón para la existencia del poder, lo mismo en un caso que en el otro? Si un abogado, en estrados, acusase al Tribunal en su presencia, de haber sido sobornado para resolver la causa, objeto de su informe, en contra de su cliente, nadie dudaría por un solo momento, del derecho del tribunal, de castigarle sumariamente por tal desacato. ¿Por qué? No porque dicho abogado había interrumpido al Tribunal en el despacho del asunto; porque no hubo tal interrupción en la vista de la causa. El tribunal tendría el derecho de castigar al culpable, porque el lenguaje empleado era destinado y deliberado para destruir la confianza del pueblo en el Tribunal, y para degradar al Tribunal en la opinión del público, y para corromper las corrientes de la justicia. En tales casos, el Tribunal observaría una conducta poco respetuosa para con el pueblo, del cual es servidor, si no castigase sumariamente al culpable. Puede ser que no haya habido media docena de personas en la Sala del Tribunal, oyendo la acusación de soborno proferida contra el Tribunal; y, sin embargo, sería no solamente el derecho, sino el deber del Tribunal, castigar semejante

desacato. ¿No es absurdo decir que si el mismo abogado hubiese publicado la misma acusación en un periódico impreso en la ciudad donde el Tribunal estaba celebrando sus sesiones, cuyo periódico fuese leído por miles de personas, y ciertamente fuese leído en la Sala de justicia á la vista del mismo Tribunal, al cual dicha acusación iba dirigida, dicho abogado no sería culpable de desacato al Tribunal, por el cual debía ser castigado sumariamente? Si, según declaran los Jueces que emitieron el dictamen en la causa de Stuart v. People 3 Scam., una demanda por libelo constituye amplia vindicación en uno de los casos, entonces una demanda por calumnia la constituiría en el otro. Semejante insinuación es repugnante para un hombre de honor. Será un día triste aquél, en que, entre los Jueces del Tribunal de última instancia, que tiene en sus manos los intereses más caros del pueblo, llegue á existir la práctica, cuando sean groseramente difamados en su carácter judicial, de abandonar sus altos puestos, y presentarse ante un Jurado, en un juicio por libelo, y ser sometidos á la grosera crítica del abogado del acusado; y si tienen éxito en su demanda, sufrir que se les eche en cara que habían sido impulsados por motivos sórdidos. ¿Quién tendría respeto alguno á un Juez que siguiese semejante procedimiento? ¿No merecería éste, bajo tales circunstancias, el desprecio de todo buen ciudadano? Además, ¿qué derecho tendría dicho Juez individualmente, para exigir el pago de daños y perjuicios por un agravio inferido á él en su carácter judicial, por una injuria inferida al pueblo en su persona? En tales casos, debe siempre separarse el individuo del Juez. El Tribunal no tiene derecho á castigar, como por desacato, á alguna persona que difame á un individuo que resulta ser el Juez del Tribunal; pero la difamación es un desacato al Tribunal como tal, y un insulto al pueblo representado por dicho Tribunal, que solamente éste puede castigar como tal. Apenas menos repulsivo á todo sentido de dignidad judicial, es la indicación de que el Juez había de hacer el papel de testigo acusador en un juicio celebrado con motivo de una acusación por libelo. Si ese día llegase jamás, cuando esa fuera la única protección que quedase á los Tribunales de Justicia, contra publicaciones que afecten su integridad judicial, entonces no se podrá esperar que nadie, excepto los viles y depravados, ocupen puestos judiciales."

State v. Frew 49 Am. Rep. 271.

De los extractos anteriores, que podrían extenderse hasta formar tomos, se ve claramente, cuales son las fa-

cultades y los deberes de los Tribunales Judiciales en casos de esta índole. Así como el tribunal no tiene el poder de castigar un desacato simplemente para satisfacer un sentimiento personal de indignación ó resentimiento, si es que pudiera hallarse un Juez que fuera tan vil, que desease hacerlo así, el Tribunal no tiene el derecho, en vista de la ley, y de su deber judicial, de perdonar un delito de esta índole, por una equivocada idea de generosidad, compasión ó benevolencia. Es exactamente tan obligatorio para los Tribunales, castigar desacatos, cuando resulten probados ante los mismos, como lo es el aplicar la ley con respecto á robos ó incendios intencionales, ó cualquier otro crimen nefando. Puede que sea un deber más duro, pero no debe ser esquivado por esa razón. Cuanto más arduo sea un deber, tanto más cuidadosa debe ser una persona para cumplirlo completa y escrupulosamente. Yo no pretendo sentar reglas para que las sigan otros jueces, al consignar simplemente mis ideas sobre cuestiones que surjen en el curso de los asuntos, conforme éstos se presentan para mi propia consideración. Todo hombre debe seguir la senda del deber, tal como la vea trazada delante de sí. Mi camino es claro.

Por lo que á mí respecta, nunca consentiré en rebajar la dignidad del tribunal á que pertenezco, ó en abdicar su autoridad, ni permitiré jamás que se convierta en blanco de injurias, amenazas ó falsedades. Es para mí un motivo de sentimiento, el que los otros miembros de este Tribunal, no estén de acuerdo conmigo en este asunto; pero seguro como estoy, tanto de la corrección de mi actitud como de la propiedad del curso que he indicado, estoy dispuesto á sostenerlos en todas las ocasiones en que así proceda.